[No. H030808. Sixth Dist. Dec. 27, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHNNY VIET LE, Defendant and Appellant.

**COUNSEL**

Kyle Gee, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Seth K. Schalit and John H. Deist, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**ELIA, J.**—A jury found appellant guilty of the second degree murder of his wife's lover and also found true an allegation that he had personally used a deadly weapon. (Pen. Code, §§ 187, 12022, subd. (b).) The trial court sentenced him to a state prison term of 15 years to life. Appellant contends, "The trial court erred in instructing under CALCRIM No. 917 that mere 'words' cannot establish a defense to battery, and in permitting the prosecutor to argue to the jury, over objection, that 'words' cannot legally constitute 'provocation' to reduce a homicide to manslaughter." Appellant further contends that the prosecutor committed misconduct during closing argument and that the trial court erred in responding to a jury question. We reverse.

*Evidence at Trial*

On May 23, 2003, appellant approached correctional officer Bjorn Meil at the information desk of the Santa Clara County jail. He told Officer Meil that he had an emergency. Meil asked him to wait while Meil concluded his conversation with another person. Appellant waited calmly and, when Meil was finished, appellant told him, "I just killed someone and I want to turn myself in." In response to Meil's question, appellant said that he had slit the victim's throat and "cut his head off." When Meil's supervisor arrived and asked appellant how he was doing, appellant said, "Not too good. I just killed somebody." Appellant told a Vietnamese-speaking officer, in Vietnamese, the location of the slaying and said, "He is having an affair with my wife. I want warn him, but he say that he's not afraid of me. So I call him to come to

location and I kill him. I slit his throat." Appellant had with him a plastic bag with a notebook, his driver's license, a videotape, and some cassette tapes.

Appellant was arrested and questioned by two police officers, one of whom spoke Vietnamese. Most of the questions and answers were in Vietnamese, with one officer translating and paraphrasing for appellant and the other officer. The transcript of appellant's statement is well over 300 pages long. Although appellant did not testify at trial, a recording of the interrogation was played for the jurors, who were also provided with copies of a transcript of this questioning with the Vietnamese portions translated into English.

Before formal advisement of appellant's rights could be completed, appellant told the officers, "I come here because I made a mistake because of my anger . . . ." Appellant told the officers that his wife, Nga Pham, had been having an affair with the man that he had killed, Van Van Truoung, known as Thang. He said, "This guy was dating my wife." Appellant said that Thang was involved in gang activity and that he was afraid that Thang's associates were "gonna retaliate by killing me."

Appellant and Pham met and married in Vietnam. They came to the United States in 1989, settled in San Jose, and raised three children. Appellant became a plumber and had his own business. Pham testified that appellant was a "very good husband," that he loved her "a lot," and that "after 21 years of marriage, he never raise his hand on me."

Pham began an affair with Thang when Thang, who had a mobile auto repair business, came to repair her broken car window. In November 2002, appellant found out about the affair and Pham admitted to it. Appellant said that they were able to "iron things out between us, husband and wife." Pham testified that she promised appellant that she would stop. Appellant called Thang "to tell him to stop." Appellant also cut off a portion of his finger as a symbol "[m]eaning to forgive all" so they could "start a new life."

The affair continued. At Thang's request, Pham loaned Thang $10,000.[1] Thang told Pham not to mention this money to appellant or he would tell appellant about the affair. Appellant discovered that the affair was not over, began to monitor Pham's telephone calls, and took photographs of the hotels and restaurants where Pham had met with Thang.

In April 2003, appellant took Pham and their children to Vietnam. He met with Pham's parents and showed them a notebook containing his proof of the affair. According to appellant, Pham's parents "advised my wife not to

---

[1] Pham testified that she also lost all of her and appellant's savings, $15,000, gambling.

continue to have anything to do with this guy." Pham promised, in front of her parents, to end the affair. The family returned to the United States.

The affair continued. Appellant shaved his head and considered becoming a monk. Appellant told the police, "I wanted to divorce to end everything so that I wouldn't be heartbreaking anymore." Pham did not want a divorce. In May 2003, appellant and Pham decided to move their family to Texas. Pham did not tell Thang about the move. She did not tell him because "he kept telling me . . . if something happened, he wouldn't have to move his finger." He had underlings "who would take care of business."

Appellant and Pham caravanned with the help of relatives to bring their belongings and vehicles to Texas. On the way, Pham received a call from Thang. Pham put Thang on speakerphone and appellant and another relative heard the call. Thang asked Pham for $10,000 for a trip to Vietnam. He also asked for money to start a business in another state. When Pham said that she did not have the money, Thang asked her whether appellant carried any life insurance.

In mid-May 2003, Pham and appellant returned to San Jose from Texas to collect their children who were finishing up the school year. Once in San Jose, appellant wanted to meet with Thang. He wanted to take pictures of Thang "so that I could send them back to my wife's parents to let them know his face." He also wanted to "be friend with Thang so that he could understand my circumstances and he would stay away from the wife." He said that he believed that he and Thang could then "go hang out and have a few drinks later." He planned to call Thang to have him fix the broken windshield of a relative's car. He thought, "Broken glass gives me a chance to make friends."

On the morning of May 23, 2003, appellant worked a plumbing job with a relative, Toan Duong. Appellant and Duong retuned to appellant's house when the job was finished. While Duong waited outside, appellant and Pham discussed Thang. Appellant asked her if Thang had called her. She said no. Appellant explained to Pham his idea of calling Thang to replace the broken glass "So that I would have this opportunity to make friend with this guy." Appellant told Pham that he wanted to take Thang's picture.[2] Pham did not want appellant to meet Thang. As Pham testified, "We exchanged words. We

---

[2] Pham testified that she had shown a photograph of appellant to Thang. She said, "So my husband, I believe, was concerned that since he had known my face, it would be important for me to have his picture. If something happens to me, then my kids will know who he was." Pham had told appellant that Thang was "very mean. Each time we got in the car, [Thang] would tell me that he was not afraid of anyone. He always threaten me. Then I got afraid. And when I went home, I would tell my husband about it."

became loud. And I became angry . . . I told him, 'If you good, then you go suck his penis. Stop asking me questions.' "

Appellant was "so mad" that he asked Pham for the keys to the only car that they had left in San Jose at the time so that he could "take a drive or something." Pham refused to give him the keys. Appellant then left with a bicycle with two flat tires. Appellant told the police, "At the time when I was leaving the house, I was heated. I was very angry. I was angry because my wife wouldn't let me meet that guy." When Pham said that she did not want appellant to see Thang, appellant felt, "Wow, I am, angry right away because my wife, that I can, that's my wife, still loved Thang. I am very angry."

Toan Duong saw that appellant was very angry. Duong had known appellant for 17 years and considered him a "peaceful person." Duong testified that he had never before seen appellant so angry. He offered to take appellant for a cup of coffee "to cool him down." Appellant told him, "No, I'm going to take the bike for about 30, 45 minutes to get some fresh air, then I'll come back." Duong followed appellant as appellant walked the bike to a gas station to put air in its tires. Duong met appellant at the gas station and offered to put the bike in his van. Appellant said, "No, I need some fresh air." Appellant was "still very angry as when he left the house." Duong "ran after [appellant] and begged [him] to return home." Appellant refused.

Appellant rode the bicycle to a Vietnamese market where he purchased a large butcher knife and a smaller one. He told the police, "I bought the knives only because I was too angry at that time, like this affair is still going on. Like I bought the knives, waiting for the opportunity to—At that time, I don't know why I just wanted to kill, that's all. . . . I was way too angry when I was on the road." When he bought the knives, he had the idea of killing Thang. He said, "I was very angry at my wife. . . . I couldn't control myself anymore."

Appellant rode his bicycle to a residential neighborhood. Using a feature that would block the display of his number, he called Thang's cell phone, identified himself as a Mr. Ha, and said that he had a car that needed windshield repair. Thang told him to call back in 15 minutes. When appellant called Thang again, Thang told him he would be free in a half-hour. Appellant gave Thang an address of a vacant house for the damaged car. Appellant told the police that as he waited for Thang, "I . . . call[ed] my friends, relatives and bid farewell to them. I only told them that tonight I will be in jail. I did not tell them that within the next half an hour I'm gonna kill Thang."

Appellant hid, with the butcher knife in his waistband, as Thang drove up to the address that appellant had given him. Appellant directed Thang to a car

parked nearby. As Thang went to inspect the windshield of the car, appellant hit Thang in the neck with the knife. Appellant said, "I cut him once, he ran, I chased after him and I continue cutting him." Appellant explained, "I butcher unexpectedly." Appellant had been told that Thang was not afraid of anyone, and was a member of a "Black society." Appellant said, "I continuously swang forward at him, I didn't want him to live; otherwise, he'll kill me back." It had been between an hour and an hour and a half since appellant had had the argument with Pham.

A forensic pathologist later determined that Thang died from several "chop" wounds to the neck, most of which would have required a significant amount of force. One blow severed Thang's spine, and probably would have been fatal by itself.

Appellant put the knife in a plastic bag on the handlebars of his bicycle and rode to his brother's house. Appellant arrived at Dan Le's house with his clothes covered in blood and told his brother that he had just killed a man. When Dan Le asked appellant why he had killed a man, appellant told him, "That guy took my wife. At the same time, he was also usurping my assets. And at the same time he also asked me to go to a park in order to have a fight."[3] Appellant cleaned himself up and changed his clothes. A woman staying at Dan Le's house drove appellant to the jail where he surrendered himself.

In addition to Toan Duong's testimony that appellant was a peaceful person, appellant's brother testified that for appellant's "whole life," until the day of the homicide, appellant "did not have any physical fights or verbal arguments with anybody at all." Nhan Ngo testified, "Since I known him, since he was 16, I never saw him fighting with anyone. He has a very peaceful life, very gracious with everyone, very polite with everyone, hard worker." She said that appellant was a good husband and good father. Toan Nguyen, who was in a relationship with Thang's ex-wife, testified that Thang had threatened him and had bragged about being a gangster.

Paul Leung testified as a specialist in cross-cultural psychiatry. Leung is a professor and a psychiatrist with a particular focus on "patients from Asia." He described the differences between acute and chronic stress and the importance of "saving face" in Asian culture. He said that an ordinary person under enough pressure "sooner or later will break" or "snap." He said that at that point, he would expect to see "raw emotions, rage, confusions, disappointment, frustrations, irrational behavior maybe, going out of your mind

---

[3] Dan Le testified that when he was interviewed by the police later that day he did not say that appellant had said that Thang had asked appellant to go to a park to fight.

maybe." This can bring a person to act rationally while in the process of committing an irrational act.

The prosecutor argued that appellant was guilty of first degree murder under either of two theories, lying in wait or premeditation and deliberation. Defense counsel argued that the crime was voluntary manslaughter. After deliberating for two full court days and part of another, and asking three questions about provocation and heat of passion, the jury convicted appellant of second degree murder.

*Judicial Council of California Criminal Jury Instructions (2006–2007) CALCRIM No. 917—Mere Words*

Appellant contends, "The trial court erred in instructing under CALCRIM No. 917 that mere 'words' cannot establish a defense to battery, and in permitting the prosecutor to argue to the jury, over objection, that 'words' cannot legally constitute 'provocation' to reduce a homicide to manslaughter."

*Background*

The prosecutor filed a motion in limine summarizing the evidence in the case and contending, among other things, that "No manslaughter instruction should be given." The written response from the defense was that the request "should be deferred until after the evidence has been received." During argument on the motions in limine, the prosecutor argued that "it's not an issue in this case to allow a manslaughter instruction." The court said, "Let's not go to the issue of the manslaughter instruction. I think that there is a sua sponte responsibility to give it, but we don't need to deal with that now."

The trial commenced and, after both sides had rested, the court conferred with counsel about jury instructions during an unreported session. The trial court instructed the jury on first degree murder, premeditation and deliberation, and lying in wait. The trial court instructed the jury that provocation "may reduce a murder from first degree to second degree and may reduce a murder to manslaughter."

The trial court instructed the jury on the lesser included offense of voluntary manslaughter as a homicide committed in the heat of passion, pursuant to CALCRIM No. 570 which provides in part as follows, "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. [¶] The defendant killed someone because of a sudden quarrel or in the heat of passion if: [¶] One, the defendant was provoked; [¶] Two, as a result of provocation, the defendant acted rashly and under the influence of

intense emotion that obscured his reasoning or judgment; and [¶] Three, the provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment. [¶] Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection. [¶] In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time."[4]

At the prosecution's request, and over defense objection, the court also instructed the jury pursuant to CALCRIM No. 917 that, "Words, no matter how offensive, and acts that are not threatening, are not enough to justify an assault or battery."

During his closing argument, the prosecutor, discussing voluntary manslaughter, said, "Now, the law seeks to be fair as possible to people, and that's why you get an alternative. Even though I don't—I never charged this as anything but a murder. You get this option, if you wish, to consider a lesser included offense, to bend over backwards to be fair to the defendant. It doesn't mean that the judge thinks or I think that there is evidence there of a manslaughter, but it's an option. And that's why you are going to get this instruction." The prosecutor argued that it was "legally . . . impossible" for a murder to be reduced to manslaughter based on an insult. He said, "Merely calling someone a bad name can never amount to sufficient provocation. [¶] You've already heard this instruction. The law has even taken that more clearly than just making it part of the reasonable man standard, but *it's clear that nothing anyone says to you, or if it's just words, can allow you to kill someone and justify*—" At this point, defense counsel objected and the court overruled the objection. The prosecutor continued, "Provocation, heat of passion? He never had any contact with that man that day. How can he claim provocation when he gets in a fight with his wife? No reasonable man could claim that. [¶] *As a matter of law, the insult from his wife cannot be provocation that would reduce this from murder to manslaughter.*"

During deliberations, the jury asked, "In [CALCRIM No. 570]: In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation **as I have defined it**. We could not find a definition of provocation in the jury instructions. How is provocation legally defined?" (Original boldface.) The

---

[4] The trial court also instructed the jury, pursuant to CALCRIM No. 571, on voluntary manslaughter on an imperfect self-defense theory.

trial court answered, "Provocation may be anything that arouses great fear, anger or jealousy. Webster's Dictionary defines it as follows: 'To cause anger, resentment, or deep feeling in; to cause to take action; to stir action.' "

The jury's next question was, "In [CALCRIM No. 570]: The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a **sudden quarrel** or in the heat of passion. Does the **'sudden quarrel'** have to be with the victim?" (Original boldface.) The trial court answered, "Unfortunately, we can provide you with no further instruction regarding this issue. This is a question of fact for the jury to decide."

Later, the jury asked, "[CALCRIM No. 570]: As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; Does this have to directly lead to voluntary manslaughter (as defined by [CALCRIM No. 570]) or does the provocation just have to lead to the state of mind ('Heat of Passion') regardless of [the] ultimate result or decision reached in that state of mind?" This question remained unanswered at the time of the verdict.

*Discussion*

Appellant contends, "The trial court erred in instructing under No. CALCRIM 917 that mere 'words' cannot establish a defense to battery, and in permitting the prosecutor to argue to the jury, over objection, that 'words' cannot legally constitute 'provocation' to reduce a homicide to manslaughter."

CALCRIM No. 917 is found in the Judicial Council of California Criminal Jury Instructions in the section "Assaultive and Battery Crimes" and under the subheadings, "Assault" and "Simple Assault." Penal Code sections 692, 693, and 694 state when an assault is justifiable and not a crime. Provocation by offensive words is not among the listed circumstances. Thus, CALCRIM No. 917 correctly states the law that mere words will not justify an assault.

In contrast, CALCRIM No. 570 is found in the Judicial Council of California Criminal Jury Instructions in the "Homicide" section and under the subheadings "Manslaughter" and "Voluntary." The instruction expands upon Penal Code section 192, which defines voluntary manslaughter as "the unlawful killing of a human being without malice . . . [¶] . . . upon a sudden quarrel or heat of passion." (Pen. Code, § 192, subd. (a).) CALCRIM No. 570 is accompanied by notations under the heading "Heat of Passion—Sufficiency of Provocation—Examples." Among the examples given of sufficient provocation are "verbal taunts by an unfaithful wife (*People v. Berry* (1976) 18 Cal.3d 509, 515 [134 Cal.Rptr. 415, 556 P.2d 777]); and the infidelity of a lover (*People v. Borchers* (1958) 50 Cal.2d 321, 328–329 [325 P.2d 97])."

■ *People v. Valentine* (1946) 28 Cal.2d 121 [169 P.2d 1] established the rule that words of abuse, insult or reproach may incite the heat of passion specified in the Penal Code section 192 definition of manslaughter, and hence may constitute sufficient provocation to reduce the offense of intentional homicide from murder to manslaughter. *Valentine* dealt with the question of whether provocative words " 'are of themselves sufficient to reduce the offense of an intentional homicide with a deadly weapon from murder to manslaughter' " as a matter of law. (28 Cal.2d at p. 140.) The *Valentine* court resolved a split of earlier authority and said that it was a question for the jury to decide whether the facts were sufficient to show that the defendant acted under the heat of such passion as would naturally be aroused in an ordinarily reasonable person.

■ Here, it was error to give CALCRIM No. 917.[5] As defense counsel argued unsuccessfully to the trial court, "to lift one sentence out of the [CALCRIM] instruction for a misdemeanor to apply here merely because there is evidence that my client's wife said something to him, which increased or caused the provocation, is inappropriate and improper." This case was not one in which the issue was provocative words as justification for an assault. Rather, the issue was appellant's state of mind and the effect of provocative words upon it. It was for the jury to decide whether Pham's words, combined with the other evidence of provocation, "would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment." (CALCRIM No. 570.)

The error was exacerbated by permitting the prosecutor, while making reference to CALCRIM No. 917, to argue that "it's clear that nothing anyone says to you, or if it's just words, can allow you to kill someone . . . . As a matter of law, the insult from his wife cannot be provocation that would reduce this from murder to manslaughter." The prosecutor's argument essentially removed consideration of appellant's confrontation with his wife, and her insulting response, from the jury's evaluation of provocation and its impact on appellant's state of mind. That the instruction and the prosecutor's argument caused confusion among the jurors is obvious from the questions they asked. First, the jury asked, "How is provocation legally defined?" The response, that provocation was "anything that arouses great fear, anger or jealousy," did nothing to inform the jurors that they could ignore CALCRIM No. 917 and consider the confrontation in determining provocation. The jurors then took a different approach, apparently examining the "sudden quarrel" prong of voluntary manslaughter, asking, "Does the **'sudden quarrel'** have to be with the victim?" (Original boldface.) The response, that "This

---

[5] Respondent recognizes that CALJIC No. 917 "appears inconsistent with a handful of cases which have stated that 'there is no specific type of provocation required by section 192 and . . . verbal provocation may be sufficient.' "

is a question of fact for the jury to decide" again did nothing to inform the jurors that they actually could consider the confrontation in determining provocation.

The jury's third question was: "As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; Does this have to directly lead to voluntary manslaughter (as defined by [CALCRIM No. 570]) or does the provocation just have to lead to the state of mind ('Heat of Passion') regardless of [the] ultimate result or decision reached in that state of mind?" This question was never answered for the jury; the trial court told the jury that the court did not understand the question.

The jury was constrained by CALCRIM No. 917, and the prosecutor's related argument, from considering the confrontation between appellant and Pham on the day of the homicide in determining whether appellant "killed someone because of a sudden quarrel or in the heat of passion." (CALCRIM No. 570.) In pursuit of a first degree murder conviction, the prosecutor presented significant evidence of premeditation and deliberation, as well as lying in wait, and the jury heard argument and instructions on those theories. Yet the jury found appellant not guilty of first degree murder. The trial court instructed the jury that provocation "may reduce a murder from first degree to second degree and may reduce a murder to manslaughter." What was left for the jury to do, given the limits on the use of the evidence of provocation under which it was operating, was to convict appellant of second degree murder. Had CALCRIM No. 917 not been given, and had the prosecutor not argued its application to determining provocation, it is reasonably probable that there would have been a verdict more favorable to appellant.

Respondent argues that "the evidence did not permit a voluntary manslaughter conviction," "the trial court instructed the jury on voluntary manslaughter, out of an apparent abundance of caution, and those instructions as a whole were favorable to appellant," and "even if there were any errors, they were harmless under the facts of the case."

■ Voluntary manslaughter is the unlawful killing of another person without malice "upon a sudden quarrel or heat of passion." (Pen. Code, § 192, subd. (a); see *People v. Koontz* (2002) 27 Cal.4th 1041, 1086 [119 Cal.Rptr.2d 859, 46 P.3d 335].) Under that theory, an unlawful killing is voluntary manslaughter " 'if the killer's reason was actually obscured as the result of a strong passion aroused by a "provocation" sufficient to cause an " 'ordinary [person] of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than judgment.' " ' [Citation.]" (*People v. Lasko* (2000) 23 Cal.4th 101, 108 [96 Cal.Rptr.2d 441, 999 P.2d 666].)

As the examples given in the CALCRIM manslaughter instructions indicate, provocation can include the verbal taunts of an unfaithful wife and infidelity. There was evidence of both here. Furthermore, there was evidence that appellant was acting "rashly and under the influence of intense emotion that obscured [his] reasoning or judgment." (CALCRIM No. 570.) The evidence showed that appellant was a 47-year-old man with a peaceful disposition and no criminal record. Appellant described his state of mind after the confrontation with Pham as "way too angry," and Toan Duong's observations of appellant at the time confirm this. During the police interrogation, appellant was asked repeatedly if he knew "that it's wrong when you kill someone, that you are not supposed to do that." Appellant answered, in a halting description of classic heat of passion, "When I angry, angry, uh, I, I, I don't know. I. I uh, e-everything. I don't know, I, I don't, I don't think go to jail, I don't think nothing. I, I just uh, know, kill him." It was entirely appropriate for the trial court to give the voluntary manslaughter instructions.

Respondent argues that instructions on voluntary manslaughter "were particularly beneficial to appellant because they did not explain that provocation must be triggered by words or conduct of the victim." Respondent further asserts, "Even if CALCRIM No. 917 were unnecessary (or even inappropriate) in this case, the error was meaningless because the defense attorney never argued that Pham's argument with appellant, without more, triggered the killing of Thang. . . . [T]he defense theory of the case was appellant had killed Thang in response to Thang's conduct, Pham's conduct, *and* Pham's taunting words."

"The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim. [Citations.]" (*People v. Lee* (1999) 20 Cal.4th 47, 59 [82 Cal.Rptr.2d 625, 971 P.2d 1001].) The provocative conduct may be physical or verbal, and it may comprise a single incident or numerous incidents over a period of time. (*Ibid.*; *People v. Wharton* (1991) 53 Cal.3d 522, 569 [280 Cal.Rptr. 631, 809 P.2d 290]; e.g., *People v. Berry, supra*, 18 Cal.3d at pp. 515–516 [provocation over a two-week period and 20 hours between last provocative act and killing]; *People v. Brooks* (1986) 185 Cal.App.3d 687, 695 [230 Cal.Rptr. 86] [two hours not, as a matter of law, sufficient cooling-off period].)

Respondent's argument ignores the fact that the prosecutor used CALCRIM No. 917 to take Pham's insulting words to appellant, and consequently their impact on appellant, out of the equation for the purpose of determining provocation and heat of passion. The prosecutor was permitted to argue, once the defense objection was overruled, "Provocation, heat of passion? He never

had any contact with that man that day. How can he claim provocation when he gets in a fight with his wife? No reasonable man could claim that. [¶] *As a matter of law, the insult from his wife cannot be provocation that would reduce this from murder to manslaughter.*" (Italics added.)

Here, defense counsel argued that Thang had taken appellant's "wife" and "savings" and, referring to Thang's inquiry to Pham about appellant's life insurance, suggested that Thang would take appellant's "life." Defense counsel argued that, as to provocation, "Thang is the source of this case. . . . Thang is the source of the infidelity." Counsel reviewed the evidence of appellant's attempts to forgive his wife and Thang for their affair, including the trip to Vietnam and the move to Texas. Counsel argued that "the one constant is that Thang will not stop." Counsel argued that during appellant's heated exchange with Pham on the morning of the killing, "it's pretty clear that Thang, the source of this heat of passion, this provocation, is continuing to insert himself into this man's life." Thus, the defense to the charge of murder was that the provocation was the ongoing affair, in which appellant reasonably believed Thang was involved, and included Pham's suggestion that appellant have oral sex with Thang. This was not only perceived by appellant as an insult, but also contained for him the information that his "wife still loved Thang." Thus, Thang was very much a party to the provocation here. Pham's insult simply served as the spark that caused this powder keg of accumulated provocation to explode.[6] As appellant told the police, "I come here because I made a mistake because of my anger." CALCRIM No. 917, and the prosecutor's argument about the application of that instruction to the evidence in this case, told the jury that it was not to include that spark in its consideration of provocation. We therefore do not consider the error in giving CALCRIM No. 917 to be, as respondent described it, "meaningless." As we have explained, it was error to give CALCRIM No. 917 and to permit the prosecutor to argue its application to determining provocation. It is reasonably probable that in the absence of these errors there would have been a verdict more favorable to appellant.

### Prosecutorial Misconduct

Appellant contends, "Misconduct occurred in argument, which requires reversal of the judgment." Appellant points to the part of the prosecutor's

[6] Using CALCRIM No. 917 to discourage the jury from considering the relationship between the accumulated provocation and the insult, the prosecutor argued, "As a matter of law, the insult from his wife cannot be provocation that would reduce this from murder to manslaughter. [¶] The fact that this victim had been having an affair with his wife for six months, well, obviously, that's a motive, but it didn't happen the first time he discovered it. The fact that he was aware this affair going on was six months. That shows it had to have been thought about for a long time. It will not justify this explosion, this final decision when he decides to murder him."

argument in which he said, that, although the court was giving voluntary manslaughter instructions, "It doesn't mean that the judge thinks or I think that there is evidence there of a manslaughter, but it's an option." Appellant argues, "It is clear that the prosecutor misstated the law. The trial court in instructing on 'heat of passion' and 'imperfect self defense' found that there was 'substantial evidence' to support a voluntary manslaughter verdict under either theory. It was a misstatement of law—as well as an improper insertion of 'personal belief' in guilt—to have argued as the prosecutor argued in this case."

Respondent cites *People v. Visciotti* (1992) 2 Cal.4th 1 [5 Cal.Rptr.2d 495, 825 P.2d 388], a capital case in which our Supreme Court said that it was not misconduct "for the prosecutor to anticipate the instructions on lesser included offenses which the court would give by arguing that those instructions were required by law and did not indicate that the court necessarily believed that the instructions applied. A prosecutor is entitled to argue that the evidence shows beyond a reasonable doubt commission of the charged offenses, and that it does not support only a lesser included offense. We see no impropriety in this context to a statement that the fact that instructions are given on lesser offenses should not be understood by the jury as reflecting the view of the court as to the sufficiency of the evidence to support conviction of the charged offense." (*Id.* at p. 83.)

We think that there is a subtle but important difference between arguing that the giving of instructions on a lesser included offense should not be interpreted by the jury as an indication that the trial court believes that there is insufficient evidence to support conviction of the charged offense, and arguing that the giving of instructions on a lesser included offense does not mean that "the judge thinks . . . that there is evidence" of the lesser included offense. The trial court's decision to instruct on the lesser included offense of voluntary manslaughter was based, presumably, on its assessment that there was substantial support in the evidence for this theory.[7] In other words, contrary to what the prosecutor argued, the giving of the instructions on manslaughter *does* mean "that the judge thinks . . . that there is evidence

---

[7] "The trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request." (*People v. Blair* (2005) 36 Cal.4th 686, 744 [31 Cal.Rptr.3d 485, 115 P.3d 1145].) "That obligation encompasses instructions on lesser included offenses if there is evidence that, if accepted by the trier of fact, would absolve the defendant of guilt of the greater offense but not of the lesser. [Citations.]" (*Id.* at p. 745.) "To justify a lesser included offense instruction, the evidence supporting the instruction must be substantial—that is, it must be evidence from which a jury composed of reasonable persons could conclude that the facts underlying the particular instruction exist. [Citations.]" (*Ibid.*) In other words, " '[s]ubstantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[]" ' that the lesser offense, but not the greater, was committed. [Citations.]" (*People v. Breverman* (1998) 19 Cal.4th 142, 162 [77 Cal.Rptr.2d 870, 960 P.2d 1094].)

there of a manslaughter." Because we are reversing the judgment for the reasons stated above, we need not decide whether this argument was prejudicial misconduct.

*Response to Third Question from the Jury*

Appellant contends, "The trial court erred under the federal Constitution, and under California law, in asking the jury to clarify its third question in defense counsel's absence, and in accepting a verdict without responding to the third question as requested by the defense."

The jury asked, "[CALCRIM No. 570]: As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; Does this have to directly lead to voluntary manslaughter (as defined by [CALCRIM No. 570]) or does the provocation just have to lead to the state of mind ('Heat of Passion') regardless of [the] ultimate result or decision reached in that state of mind?" Defense counsel was "delayed 20 minutes" and thus was not immediately available. The court consulted with the prosecutor and responded, "Could you be more specific? (We do not quite understand your question.)" The jury deliberated for over half an hour more and was excused for the weekend. On Monday morning, defense counsel proposed two responses to the jury's third question.[8] However, at 10:00 a.m. the jury announced that it had reached a verdict, which the court then received.

Citing cases about "the constitutional guarantee of defense counsel's participation in communications with the jury," appellant argues that "The trial court should not have responded to the jury's question, even with a request for clarification, until defense counsel had appeared and had an opportunity to participate in that decision." In light of our resolution of the instructional issue above, we need not decide this question.

---

[8] Defense counsel proposed two responses based on *People v. Najera* (2006) 138 Cal.App.4th 212 [41 Cal.Rptr.3d 244]. The first was: "The focus is on the provocation—the surrounding circumstances—and whether it was sufficient to cause a reasonable person to act rashly. How the killer responded to the provocation and the reasonableness of the response is not relevant to sudden quarrel or heat of passion." The second was: "The focus [is] on the provocation and the surrounding circumstances. Was the provocation such that it would cause a reasonable person to act rashly? If the provocation was sufficient to cause an ordinary person to act rashly then the threshold of 'sudden quarrel' or 'heat of passion' has been reached. The person's actual response to the provocation is not relevant."

*Disposition*

The judgment is reversed.

Rushing, P. J., and Premo, J., concurred.