Filed 11/22/13  P. v. Walker and Dizadare CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>EMMANUEL ULYSSES WALKER and NORVIN DERMARCUS DIZADARE,<br><br>　　　　Defendants and Appellants. | B244140<br><br>(Los Angeles County<br>Super. Ct. No. NA089007) |

　　　　APPEALS from judgments of the Superior Court of Los Angeles County.  Mark C. Kim, Judge.  Affirmed.

　　　　Leslie Conrad, under appointment by the Court of Appeal, for Defendant and Appellant Walker.

　　　　Sharon M. Jones, under appointment by the Court of Appeal, for Defendant and Appellant Dizadare.

　　　　Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, and David E. Madeo, Deputy Attorney General, for Plaintiff and Respondent.

_____

Defendants Emmanuel Ulysses Walker and Norvin Dermarcus Dizadare appeal from the judgments entered following a jury trial in which they were convicted of second degree murder. They contend the trial court erred by failing to instruct on voluntary and involuntary manslaughter as lesser included offenses. We affirm.

## BACKGROUND

In May of 2011, Denise W. lived in a house in Long Beach with her 13-year-old son D.W., her three younger children, Steven Brown, and her brother, defendant Walker. (Date references pertain to 2011.) Brown was the father of Denise's youngest child, and Denise and Brown had maintained an "off and on," "love/hate" relationship for about 13 years. Denise and Brown argued from time to time and a few times this had resulted in violence between them. Brown was usually the aggressor. Brown was also disrespectful and verbally abusive toward Denise. D.W. testified he had previously seen Brown hit his mother. A week or two before May 16, Denise and Brown had argued and Walker made Brown leave the house. Brown resisted and tried to push his way back inside. Brown stayed at his godmother's house after that, but by May 16, Denise missed him and wanted him to come home.

Denise testified that Walker had known Brown for about as long as she had, and they got along. Walker testified that Brown was like a brother to him, and they had a good relationship.

Denise testified that on the night of May 16, she, her children, Brown, and Walker were home. Dizadare, whom Denise knew only as "Loco," arrived around 8:00 p.m. Before that night, Denise had just said hello to Dizadare a few times, and Brown had not met him. The four adults sat around in the living room, drinking brandy and talking. When the brandy was gone, they went out and bought another bottle and resumed drinking. Brown and Walker left to attempt to buy marijuana for everyone, but they failed to find any. Upon their return, Brown stood beside Denise and "kind of like poked [her] with his finger, like elbowed [her]." She asked him what was wrong, but he did not say anything. He did not look upset and was not being violent. Denise thought he was

2

trying to get her attention. Denise drank three or four more cups of brandy, then went to bed around midnight. She testified that before she went to sleep, there had been no problems between herself and Brown, Brown and defendants, or herself and defendants. Everything was "fine, normal." They had been talking and drinking, and no one was arguing. She denied that Brown had been violent to her on May 16 or the day before, and denied that she and Brown had argued on the night of May 16 or the early morning hours of May 17.

D.W. testified that he went to bed about 11:00 p.m. on May 16. Before that, he saw his mother, Brown, Walker, and Dizadare "socializing" in the living room. They all seemed to be getting along well and were not arguing or having any problems with one another. Sometime before dawn on May 17, D.W. woke up to use the bathroom. He heard "scuffling" outside the house and went to the front door to see what was going on. He saw Walker and Dizadare "dragging" Brown by his feet from the front porch or patio out to the front yard gate. Then, as Brown lay on his back by the gate, Walker and Dizadare "started beating him up." Dizadare punched Brown in the face "several" times while Walker kicked Brown twice in the chest and once or twice in the head. Walker also punched Brown's face between two and ten times and "stomped on" Brown's chest and face. D.W. initially testified Walker stomped on Brown's chest once or twice and on Brown's face once, but increased the number each time he was asked how many times Walker stomped on Brown, ultimately testifying Walker stomped on Brown's face or head three times and on Brown's chest between five and ten times. During the beating D.W. heard one of the defendants—he thought it was Walker—twice say, but not yell, "You're going to treat women with respect." Whoever said it sounded angry. Brown was just trying to get up during this beating. He did not kick or take a swing at defendants.

D.W. testified that defendants beat Brown for five or ten minutes, then dragged him by his legs toward the alley, "hit him a few more times, and then they checked his pockets." Specifically, Walker hit Brown twice more in the face and Dizadare "socked him a few times." D.W. thought he heard Walker refer to Brown having no money.

3

Brown got up and walked toward Seventh Street, and defendants came back inside Denise's house.

About 10 to 15 minutes later, D.W. heard someone knocking at the front door of the house. He went to answer the door, but Walker and Dizadare stopped him. Walker opened the door and Dizadare told D.W., "'He's not going to hurt your mama no more.'" Walker and Dizadare went outside and Walker pushed Brown off the front porch. Brown fell over some bushes onto the grass. Walker and Dizadare dragged Brown toward the driveway, then each defendant kicked Brown in the ribs "a few more times." On redirect examination, D.W. testified that Walker and Dizadare were also "punching" Brown at this time. This went on for three to five minutes. Brown was trying to get up but was not fighting back. Defendants came back inside the house, and Brown limped slowly toward Seventh Street. Brown was "wobbly." D.W. went back to bed and slept until he awakened to the police knocking on the front door.

Brown was observed by one neighbor sitting on the front porch of Denise's house about 4:15 a.m. on May 17, and by another neighbor leaning against the wall in the alley about 5:00 a.m., then lying on the ground in the alley about 5:05 a.m. Paramedics arrived before 7:00 a.m. and found Brown lying unconscious in the driveway. He was taken to the hospital and treated for various injuries, including a subdural hematoma, but never regained consciousness. After four days he was removed from life support and died.

The deputy medical examiner who performed an autopsy on Brown testified that the cause of death was "multiple blunt force traumatic injuries" "everywhere," but "predominantly to" his head. The head injuries caused a "subdural hemorrhage of the brain, which led to his demise or death." Brown had bruises on his chest, shoulders, lower back, arms, legs, hips, and head. He also had a broken nose. There were abrasions on Brown's left middle finger and right index and middle fingers that could have been consistent with him striking someone with a fist. Blood drawn at the hospital on the morning of May 17 was tested by the coroner's office and revealed Brown's blood-alcohol level to be 0.20. A neuropathologist who examined Brown's brain after the

4

autopsy testified that the subdural hematoma caused Brown's brain to swell, especially the left cerebral hemisphere, which in turn led to compression of the brain stem, which caused a "duret" hemorrhage, which the neuropathologist opined caused Brown's death. The subdural hematoma was consistent with blunt force trauma to the head. It could take anywhere from minutes to days before such a subdural hematoma manifested. Repeated kicks and punches to the head could cause a subdural hematoma. The neuropathologist testified that "[t]he presence of alcohol may aggravate the presence of subdural hematoma."

Long Beach Police Officer Felipa Baccari knocked on the door of Denise's house about 8:15 a.m. on May 17, and D.W. answered the door. While D.W. went to get his mother, Walker came to the door. When Baccari asked if Walker knew anything about a man found in the driveway, Walker said he did not live there, he had just arrived at 8:00 a.m., and Baccari should talk to the person who lived there. Walker claimed he did not have any identification, told Baccari his name was Manuel, and gave a date of birth that differed from that on the identification card Baccari later recovered from Walker's wallet. Baccari noted that there was a "small, splatter-type, reddish, shiny stain" on Walker's jacket that looked like blood.

When D.W. woke Denise, he told her the police were at the door and that he had seen Walker and Dizadare beating Brown during the night. Baccari told Denise that a man had been found on the driveway, and Denise began screaming and asking, "'Where is he?'" Baccari asked, "'Who is "he"?'" Denise replied, "'It's my boyfriend.'"

A sergeant and Baccari spoke to D.W. at the house. D.W. described the beating and told Baccari that Brown was not fighting back, just trying to get up, and when he attempted to get up he said, "'I'm going to lay you out.'" After the police interviewed D.W., they detained Walker. Police officers collected Walker's clothing and photographed him to document any injuries. Detective Hugo Cortes testified Walker had no injuries except to his left hand, which had swollen knuckles and small lacerations on his index finger and thumb. There were red stains on his jacket and shoes. Dizadare was

5

arrested two days later, after Denise and D.W. each identified him from a photographic array. He walked with a limp, the knuckles on his left hand were red and swollen, and he had a small laceration on one finger but was otherwise uninjured.

At the scene, officers found drops of blood and blood spatter in the alley. They also found blood on the porch, window frames near the porch, the walkway near the gate, a bedroom door and surrounding door frame, and the kitchen sink, dish tray, and some dishes. They found some pants in the dryer that appeared to have blood stains, as well.

D.W. was interviewed by Detective McGuire on May 17. The interview was recorded and played at trial. D.W. told McGuire he was awakened by loud voices, including the statement, "'You're going to treat women with respect.'" He tried to go back to sleep, but the noise continued, so he went to look out the front door. From there, he saw his uncle (Walker) "stomping on my mom's boyfriend" on "his chest and his face and everything." Walker also hit and kicked Brown. "The other guy," whose name D.W. did not know, just dragged Brown toward the alley. They stopped by the gate, patted Brown down, remarked that he had no money, and returned to the house. Brown then "tried to get back in the house," but "they" went onto the porch and resumed beating Brown. "They" threw him over the bushes onto the grass, dragged him to the driveway, and "started beating him up again; started kicking him and stuff." Brown tried to sit up, but "they kept pushing him down." D.W. repeatedly told "them" to stop. Walker came back into the house, the other guy left, and Brown walked away. D.W. said that he at no time saw the other guy "hit or kick" Brown. The other guy only dragged Brown toward the alley, while Walker did all the hitting and kicking.

Walker testified that he had been living at Denise's house for about a month as of May 16. He did not see Brown at all on May 16 and did not beat him. Walker went to bed around sundown and did not drink with anyone that night or at all. Only Denise and the children were in the house when Walker went to bed, and he did not know if anyone else arrived later. Walker did not know Dizadare, but he knew Dizadare lived next door to Denise. Walker recalled hearing people arguing outside the house later in the night,

6

but he did not get up and did not see anything. Walker's right hand was "messed up" and he was "99.9 disabled." A few days before May 16 Walker had burned his left hand while ironing clothes. Walker testified he gave Baccari his correct name and birth date and showed her his identification.

Dizadare did not testify or call any witnesses.

A single jury convicted each defendant of second degree murder. Dizadare admitted he had served two prior prison terms within the scope of Penal Code section 667.5, subdivision (b). (Undesignated statutory references are to the Penal Code.) The court sentenced Walker to 15 years to life in prison. It sentenced Dizadare to 17 years to life in prison, which included two one-year section 667.5, subdivision (b) enhancements.

## DISCUSSION

**1.      Refusal to instruct on voluntary manslaughter on heat of passion theory**

Both defendants asked the court to instruct upon voluntary manslaughter based upon sudden quarrel or heat of passion. They argued sudden quarrel or heat of passion was shown by evidence that D.W. heard one of the defendants repeatedly and angrily tell Brown, "'You're going to treat women with respect'"; Dizadare told D.W., "'He's not going to hurt your mom anymore'"; Brown said, "'I'm going to lay you out'"; on one or more prior occasions Brown had been asked to leave the house; Brown and Denise had a love-hate relationship and fought; and Brown had previously been violent toward Denise. The court refused to so instruct, explaining, "There is no evidence there was heat of passion." The court noted that Denise testified that on the night of May 16 everything was fine, the group was having a good time while drinking, then she went to bed. The court further noted that Walker testified that nothing happened and he did not even see Brown or Dizadare.

Walker contends that the court erred by refusing to instruct upon voluntary manslaughter based upon sudden quarrel or heat of passion. Dizadare joins in this contention.

7

"A trial court must give a requested instruction only if it is supported by substantial evidence, that is, evidence sufficient to deserve jury consideration." (*People v. Marshall* (1997) 15 Cal.4th 1, 39.) A trial court must instruct on lesser included offenses whenever substantial evidence raises a question as to whether all of the elements of the charged offense are present. (*People v. Avila* (2009) 46 Cal.4th 680, 705.) In this context, substantial evidence means evidence from which a reasonable jury could conclude that "'the lesser offense, but not the greater, was committed.'" (*Ibid.*) The substantial evidence requirement is not satisfied by any evidence, no matter how weak. (*Ibid.*)

Voluntary manslaughter consists of an unlawful killing upon sudden quarrel or heat of passion or in an actual, but unreasonable, belief in the need to defend against imminent death or great bodily injury. (§ 192, subd. (a); *People v. Bryant* (2013) 56 Cal.4th 959, 969 (*Bryant*).) A defendant charged with murder has the burden of producing sufficient evidence on heat of passion or unreasonable self-defense to raise a reasonable doubt of his guilt of murder, unless the prosecution's own evidence suggests one of these mitigating theories. (*People v. Rios* (2000) 23 Cal.4th 450, 461–462.) If neither theory applies, voluntary manslaughter is unavailable as a lesser included offense to murder. (*People v. Ochoa* (1998) 19 Cal.4th 353, 423.)

"Where an intentional and unlawful killing occurs 'upon a sudden quarrel or heat of passion' (§ 192, subd. (a)), the malice aforethought required for murder is negated, and the offense is reduced to voluntary manslaughter—a lesser included offense of murder." (*People v. Carasi* (2008) 44 Cal.4th 1263, 1306 (*Carasi*).) "[T]he passion aroused need not be anger or rage, but can be any ""[v]iolent, intense, high-wrought or enthusiastic emotion"" [citations] other than revenge." (*People v. Breverman* (1998) 19 Cal.4th 142, 163.)

Heat of passion has both objective and subjective components. (*People v. Moye* (2009) 47 Cal.4th 537, 549.) To satisfy the objective component, the claimed provocation must be sufficient to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection, from passion rather than from judgment. (*Id.* at

pp. 549–550; *Carasi*, *supra*, 44 Cal.4th at p. 1306.) "To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react*, without reflection. . . . [T]he anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene." (*People v. Beltran* (2013) 56 Cal.4th 935, 949.) A defendant may not """"set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused . . . ."""" (*People v. Cole* (2004) 33 Cal.4th 1158, 1215–1216.) "'The provocation . . . must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim.'" (*Moye*, at pp. 549–550.) "The provocative conduct may be physical or verbal, and it may comprise a single incident or numerous incidents over a period of time." (*People v. Le* (2007) 158 Cal.App.4th 516, 528.) But "'if sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter—"the assailant must act under the smart of that sudden quarrel or heat of passion."'" (*Beltran*, at p. 951.)

"To satisfy the subjective element of this form of voluntary manslaughter, the accused must be shown to have killed while under 'the actual influence of a strong passion' induced by such provocation." (*Moye*, *supra*, 47 Cal.4th at p. 550.) Absent evidence that "'the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment'" (*People v. Barton* (1995) 12 Cal.4th 186, 201), heat of passion is inapplicable.

At most, the evidence of statements by defendants regarding treating women with respect and not hurting D.W.'s mother any more supported an inference that defendants were angry at Brown regarding his prior treatment of Denise. But there was no substantial evidence of any provocation by Brown, let alone provocation sufficient to "cause an emotion so intense that an ordinary person would simply *react*, without reflection," and "so strong that the defendant's reaction bypassed his thought process to

9

such an extent that judgment could not and did not intervene." (*Beltran*, *supra*, 56 Cal.4th at p. 949.) No one testified that Brown did or said anything on May 16 or 17 that could be deemed to constitute adequate provocation. Indeed, Denise testified that everyone was getting along well as they socialized on the night of May 16, and D.W. testified that all four adults seemed to be getting along well and were not arguing or experiencing any problems with one another. Although Denise and D.W. testified that Brown had historically been disrespectful and verbally abusive toward Denise, Brown and Denise argued from time to time, and there had been a few incidents of violence between Brown and Denise, with Brown usually being the aggressor, the evidence provided no basis for inferring that such an incident happened at anytime on May 16 or 17, or anytime during the week or two prior to May 16 when Brown had been living with his godmother. In addition, the evidence provided no basis for inferring that Dizadare knew anything about the relationship between Denise and Brown. Walker was not asked, and did not testify to any knowledge of Brown mistreating Denise or even arguing with her. He insisted he had a good relationship with Brown, who was like a brother to him. The evidence at most tended to show that Walker knew about a single incident in which he forced Brown to leave the house after Denise and Brown argued, and that incident occurred one or two weeks before defendants fatally beat Brown. Although the evidence indicated Brown had resisted leaving the house during that incident, nothing indicated Brown had been violent toward Denise or anyone else during that incident or the events that precipitated his ejection from the house. That incident could not constitute the provocation for the fatal beating one or two weeks later because sufficient time had elapsed for passion to subside and reason to return. Accordingly, the absence of evidence of adequate provocation precluded the application of sudden quarrel or heat of passion, and the trial court did not err by refusing to instruct upon voluntary manslaughter based upon that theory.

Brown's "I'm going to lay you out" statement made while defendants were beating him does not constitute evidence of provocation for the attack that was already under

10

way.  Nothing in the record indicated Brown challenged defendants to a fight or otherwise instigated the physical confrontation.

We further note that defendants did not mention Brown's "poking" of Denise as provocation in the trial court, and they do not argue this matter on appeal.  Denise testified this was not violent behavior and nothing in the record indicates either defendant saw the poke.  In addition, such a poke, without more, cannot cause anger or passion "so intense that an ordinary person would simply *react*, without reflection."  (*Beltran*, *supra*, 56 Cal.4th at p. 949.)

**2.     Failure to instruct, sua sponte, on *Garcia* theory of voluntary manslaughter**

Walker contends that the trial court also erred by failing to instruct, sua sponte, upon voluntary manslaughter "during the commission of an inherently dangerous assaultive felony, as articulated in *People v. Garcia* (2008) 162 Cal.App.4th 18."  Dizadare joins in this contention.  The California Supreme Court rejected the validity of this theory of manslaughter and overruled *Garcia* in *Bryant*, *supra*, 56 Cal.4th at p. 970.  Accordingly, we reject defendants' contention without further discussion.

**3.     Refusal to instruct, sua sponte, on involuntary manslaughter**

Dizadare contends that the trial court erred by failing to instruct, sua sponte, on involuntary manslaughter based upon his commission or aiding and abetting the commission of misdemeanor battery, as opposed to murder or assault by means of force likely to produce great bodily injury.  He argues, "[T]here was substantial evidence that [Dizadare] may have hit Brown only once, or not at all, and that he did not possess the intent to either personally inflict or to aid and abet co-defendant Walker in inflicting great bodily injury on Brown."  Walker joins in this contention, although it is inherently inapplicable to him.

During the court's discussion of jury instructions with counsel, Dizadare asked the court to instruct upon battery as the target offense to be identified in the instruction upon an aider and abettor's liability for natural and probable consequences.  The court agreed to include battery, along with assault by means of force likely to produce great bodily

11

injury, but Dizadare withdrew his request to include battery when the court refused to *exclude* assault by means of force likely to produce great bodily injury.

Non-vehicular involuntary manslaughter is a killing "in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection" (§ 192, subd. (b)), or in the commission of a "noninherently dangerous felony . . . committed without due caution and circumspection" (*People v. Burroughs* (1984) 35 Cal.3d 824, 835, disapproved on other grounds in *People v. Blakeley* (2000) 23 Cal.4th 82, 89).

Because neither defendant expressed his intent regarding the attack on Brown, their intent must be inferred from their conduct, which was a brutal beating of Brown over the course of two incidents, resulting in fatal injuries. Even if Dizadare's original intent was to commit or aid and abet Walker in committing a mere misdemeanor battery on Brown by simply striking him a few times, without using force likely to produce great bodily injury, he continued to participate and assist in the beating after Walker used force likely to produce great bodily injury. Accordingly, there was no evidentiary basis for viewing the target offense as misdemeanor battery, and thus no basis for instructing upon involuntary manslaughter. The trial court was not required to instruct, sua sponte or upon request, upon involuntary manslaughter.

We also note that although D.W.'s statement to the detective supported a view that Dizadare did not "hit or kick" Brown at all, but merely aided and abetted Walker by dragging Brown after Walker hit, kicked, and stomped him, there was no evidence "that [Dizadare] may have hit Brown only once," as Dizadare argues. In contrast to D.W.'s statement to the detective, D.W. *testified* that Dizadare hit Brown "several times" during the initial part of the first incident, "socked him a few times" after dragging him toward the alley, and, after dragging Brown to the driveway near the beginning of the second incident, Dizadare kicked Brown in the ribs "a few more times" and punched him. Under either version provided by D.W., Dizadare's conduct—whether assaultive or merely

12

dragging—continued or resumed after Walker had punched, kicked, and stomped Brown many times, thus indicating Dizadare's intent to aid and abet an assault by means of force likely to produce great bodily injury.

## DISPOSITION

The judgments are affirmed.

NOT TO BE PUBLISHED.


                                        MALLANO, P. J.

We concur:


        ROTHSCHILD, J.


        CHANEY, J.