Filed 7/22/14  P. v. Butler CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D063890 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD237121) |
| DARIUS SINCLAIR BUTLER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Charles R. Gill, Judge.  Affirmed.

Susan D. Shors, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Heather Crawford and Meagan J. Beale, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Darius S. Butler of attempted murder and three other charges involving his former intimate partner, Danielle D. (Danielle). On attempted murder (Pen. Code,[1] §§ 187, subd. (a), 664; count 4), related allegations were found true that he personally inflicted great bodily injury on Danielle (§ 12022.7, subds. (a), (e)) and personally used a deadly weapon, a knife (§ 12022, subd. (b)(1)). The jury also convicted Butler of kidnapping her to commit sodomy or oral copulation (§ 209, subd. (b)(l), count 1). He was found guilty of forcible oral copulation (§ 288a, subd. (c)(2)(A), count 2), with the allegation found true that the crime was committed in the course of a kidnapping. (§ 667.61, subds. (a)-(e).) Also, he was found to have committed sodomy by use of fear (§ 286, subd. (c)(2)(A), count 3), and allegations were found true about his personal infliction of great bodily injury and committing the crime in the course of a kidnapping. (§§ 12022.8, 667.61, subds. (a)-(e).)

On all four counts, the jury found true that the offenses were committed while he was released on bail. (§ 12022.1, subd. (b).) At sentencing, Butler received a determinate term of 19 years and a consecutive indeterminate term of 50 years to life in state prison.

On appeal, Butler claims evidence was presented at trial on the attempted murder charge that substantially supported certain sua sponte jury instructions on the lesser included offense of attempted voluntary manslaughter, but the trial court failed to recognize it had a duty to give them. (*People v. Breverman* (1998) 19 Cal.4th 142, 154

---

[1] All further statutory references are to the Penal Code unless noted.

(*Breverman*).)  Butler points to the evidence from himself and Danielle as showing that their relationship of over a year had consistently included arguments, some violent, about infidelity that both of them had committed, but the relationship nevertheless endured to some extent.  On appeal his defense theory is that after their consensual sexual activity, she unexpectedly became violent due to her jealousy of his new girlfriend, and he was provoked into passionate and heated fighting and, in self-defense, had to take away the knife she pulled on him.  In the process, he injured her wrist, causing the knife to puncture her back.  He alternatively argues he developed a mistaken belief of the need to defend himself from the knife attack, possibly due to the disparity in their sizes and abilities to carry out violence.

Butler further claims the evidence on the sexual conduct charges and the history of their relationship substantially supported a sua sponte jury instruction about his reasonable, but mistaken, belief that she was a consenting partner in all of the sexual activity during this incident.  (*People v. Williams* (1992) 4 Cal.4th 354, 360 (*Williams*); *People v. Mayberry* (1975) 15 Cal.3d 143, 153-158.)

We have examined the record and conclude that none of the claimed sua sponte duties to instruct arose.  No substantial evidence was presented to support any colorable need for provocation/heat of passion or imperfect self-defense instructions.  Rather, the evidence did not show that the relationship between Butler and Danielle was so deeply involved or exclusive such that any betrayal of his trust, by her, would objectively support an attempted voluntary manslaughter theory based upon his provoked heat of passion.  (See *People v. Le* (2007) 158 Cal.App.4th 516, 528 (*Le*).)  Nor was there

3

sufficient evidence to support any claim of reasonable mistake of fact regarding imperfect self-defense, because he was unable to supply any evidence supporting his theory of such circumstances of aggression by Danielle that would have justified any such mistaken belief in the need for self-defense. (*Breverman*, *supra*, 19 Cal.4th at pp. 162-163.)

We are also required to reject Butler's theory on appeal regarding his claimed defense of a reasonably mistaken belief in Danielle's consent to all the sexual acts that occurred between them that day. The defense theory at trial was that the nature of their relationship was such that she actually willingly consented to participating in the oral copulation and sodomy. No substantial evidence of her equivocal conduct that could have led to his reasonably mistaken belief in consent was presented at trial, to support any appellate claim of "mistake of fact" on his part. The evidence did not require the trial court to come under a sua sponte duty to so instruct. (See *Williams*, *supra*, 4 Cal.4th at pp. 360-364.)

We further reject Butler's claim that the trial court failed to carry out an adequate investigation of potential juror misconduct, with respect to an advertisement that one juror reported to the court that he had received on his Facebook page, during trial. The court questioned the individual juror on the subject, and learned that he had apparently received an unsolicited advertisement for a service that conducts criminal background checks, which showed a mug shot type photograph that resembled Butler, but that the juror believed he could put such information aside and fairly decide the case. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1284 (*Virgil*).) The record shows that the other jurors were also questioned and reported that they had not been exposed to any such

4

communications, and the trial court accordingly found no basis for a mistrial or for the requested new trial. The court's rulings are well supported, no abuse of discretion occurred, and the judgment is affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Incidents*

In 2010, Butler was in his early 20's and a tall, strong ex-Marine when he met 20-year-old Danielle (5'3" tall). They had a harmonious romantic and sexual relationship for about four months. He gave her a knife and taught her how to use it. They started to argue and physically fight about their relationship and mutual infidelity and periodically broke up, but they continued their sexual relationship off and on for about a year.

These charges arose out of an October 2011 incident involving Danielle's overnight visit to his apartment, involving drinking and consensual sex, and then the next day of being together drinking, arguing, and eventually, fighting in which she was badly injured. Additionally, the prosecution presented evidence about several incidents of Butler's earlier uncharged violent criminal conduct toward Danielle, occurring from June through September 2011. In June 2011, they argued by phone about infidelity and a sexually transmitted disease. Butler went to Danielle's home, grabbed her around the neck, threw her into a wall and a door, then choked her and pushed her to the ground. Danielle's friend, Samantha P., was present and called 911, reporting that Butler was threatening to cut Danielle's throat with his knife. After less than 10 minutes, Butler handed the knife to Danielle and left. Butler was arrested and his knife confiscated from Danielle. Butler told police that he gave the knife to Danielle because he was afraid

5

something would happen. Butler did not have any explanation for police about the reasons for the June 2011 fight.

After the June 2011 incident, the court issued a criminal protective order dated July 18, 2011 that prohibited Butler from contacting Danielle. However, they continued to call, text and see each other occasionally.

In August 2011, Butler and Danielle were driving when he angrily hit her in the throat a few times, then stopped, pulled her out of the car, and kicked her in the face and stomach. She did not go home to her parents until the next day because her injuries looked so bad. She then called police and a report was taken.

In September 2011, Butler pled guilty to dissuading a witness from reporting a crime and was released on bail, pending sentencing in November 2011. Later in September 2011, Danielle sent him some nude photographs of herself and a female friend in sexual positions together, but she then asked for the pictures back. Butler refused and told her he was going to post the photographs on the Internet. Danielle threatened to file a police report.

On September 30, 2011, Butler sent text messages to Danielle and asked her to call him, but she did not do so. She and a friend were driving away from her home when they saw Butler in his car waiting around, and he then followed her car, honked his horn and interfered with her driving, trying to get her car to veer off the road. After a few days, Danielle made a police report about the incident.

6

In mid-October, Danielle sent text messages to Butler, and on October 15, 2011, they had a two-hour phone conversation. They started arguing about their relationship and infidelity, and Butler wanted to come to her house, which her parents had forbidden. She wanted to keep him away from her friends and family and agreed to come to his apartment, so she could say goodbye and have "closure." Bringing her overnight bag, Danielle drove her car to Butler's apartment around 2 a.m. For about two hours, they drank wine, talked, had consensual conventional sex, then fell asleep.

In the morning, Danielle told Butler she was going to church, but he discouraged her from doing so, and they spent the day together, eating and drinking numerous cocktails and beers at a few bars near his apartment, where they walked. He carried a knife in his pocket, as he usually did. They went to a sushi bar for dinner, but Danielle became nauseated and went to the restroom. According to her testimony, when she returned, Butler looked angrily at her and started asking her about her unfaithfulness, and telling her she had messed with the wrong person and was not going to have a good night. When he slapped her face, Danielle did not want to talk to the employees at the restaurant or make a scene, so they left, walking through a dark alley.

In the alley, Butler hit and kicked her, knocked her to the ground, and kicked her some more. When he pulled her up, she could not move her arm. Butler told her he was going to kill her and punched her in the stomach and beat her head into the ground. For about an hour, Butler dragged and pulled Danielle back toward his house, while he continued to hurt her. When they reached her parked car, Butler shoved her into the passenger seat and got in the driver's seat. She did not run away because she was afraid

7

he would catch her and hurt her again. He unzipped his pants, showing he had an erection, and pulled Danielle's head down to his penis while he told her to orally copulate him. According to Danielle, he was holding the knife on his lap and hitting her. She told him to stop, but he continued to threaten her and force his penis into her mouth while he drove. After they traveled this way for about a half-mile, Butler parked the car, took his clothes off, pulled Danielle by the hair into the back seat, and ripped off her clothes. Danielle was on her hands and knees while he penetrated her anus several times with his penis, which hurt her. When he finished, he got dressed and started driving toward a park at the end of the street, saying he was going to kill her there where it was dark and quiet, and she believed him. He parked the car and started to pull her out by her hair. As they struggled and she screamed, his knife went into her back about an inch and she started bleeding.

Butler then started walking Danielle toward the park, and they noticed that a neighbor near the park and others were watching. Butler decided to go back to the car, Danielle got into the passenger seat, and he closed the door and walked around to the driver's seat. At that point, Danielle opened her door, jumped out and ran toward the neighbor's house and bolted into it, crying, "He is going to kill me." The neighbor, Anthony Lawrence, shut and locked the door, and had her sit down because she seemed to be hyperventilating. Next, Danielle ran up the stairs to another room and collapsed, telling Lawrence and his roommate that Butler had raped, beaten and threatened her. Lawrence called 911, telling the dispatcher that a young woman, who was a stranger to him, had run into his house to get away from a man who had been "dragging" her back to

8

their car, while apparently using his knife to control her. Before police responded, Butler knocked on the door and called for Danielle, but they did not answer and he left.

The responding police officer testified he found Danielle on a bed in Lawrence's house, in a bruised and hysterical condition. She had a puncture wound in the center of her back and was bleeding all over the bed. Blood was found on the sidewalk outside the house. While being taken to a hospital, Danielle was crying and in pain. She described to the responding officer and a detective how Butler attacked, threatened and forced her into sex acts. She also reported she had consumed three beers and a gin and tonic that evening. She gave a similar account to a deputy district attorney and the investigating detective the next day, and later at Butler's preliminary hearing.

At the hospital, Danielle was examined by medical personnel, including an orthopedic surgeon and a sexual assault response team (SART) nurse. Danielle's injuries included a fractured wrist with significant displacement, caused by blunt force trauma, and a lacerated liver. She was very "banged up" and in pain, with bruising and soreness in her face, back and anus, where she was bleeding. The nurse could not fully examine Danielle's anal area, due to the pain, but the nurse saw one laceration there. The nurse's findings about injuries were consistent with Danielle's description of the incident, but the nurse could not rule out consensual sex as a causative factor.

Butler was arrested a few days later, at his new girlfriend's home in Oceanside. His vehicle was found in her garage.

## B. *Trial Proceedings*

At trial, Lawrence testified he heard a commotion outside his house at about 7:30 p.m. that day, so he looked outside and saw Butler "shepherding" Danielle by the arm back to a white car. She looked like she had been crying. After Danielle got in the car, Lawrence saw her jump out and run toward his house, screaming that her boyfriend was going to kill her, and saying she couldn't move her arm. He didn't think she seemed intoxicated.

The prosecution presented evidence about several incidents of Butler's earlier uncharged criminal violent conduct toward his ex-wife Jessica Butler, who was then also in the Marine Corps. They were married in January 2007 and had a violent argument in October 2007. When Butler slapped, pushed, and choked his then-wife, she lost consciousness. As a result, Butler pleaded guilty to a crime of domestic violence, and a criminal protective order prohibited him from contacting her. However, they continued to have a relationship.

Another violent incident took place between them in May 2008, when he threatened and chased Jessica, then seven months pregnant, and she jumped off a second-story balcony to get away from him. He ran after her and punched or kicked her, knocking her down. Butler served time in jail and in 2009, was dishonorably discharged from the Marine Corps for domestic violence.

10

At trial, the jury heard testimony from a domestic violence expert who explained the usual dynamics of such a relationship, such as why an abused woman might continue to return to her abuser.[2]

Butler testified in his defense, first explaining that in the Marines, he had received special training in martial arts and was a black belt instructor. He was a weapons enthusiast and usually carried a knife. During their relationship, he gave a knife to Danielle and taught her how to use it. However, he did not get his own knife back after he gave it to Danielle after the June 2011 incident.

Butler acknowledged that both he and Danielle disrespected each other when they cheated on each other, during their relationship of one and a half years. By June 2011, when they had the fight at her home, they had been together for about a year and she was angry that he had relationships with other women. That day, she told him she was unfaithful to him, using a racial slur. Butler said he pushed her against the wall, she apologized, and they both calmed down. He did not open his knife that day.

During the incident in August 2011, he said Danielle got upset when he lost the keys to a car that she was driving, but they did not fight about it. When he was arrested a few days later for assaulting Danielle, he denied it. When Danielle sent him nude photographs of herself and a female friend in September, Butler refused to give them back. He was upset about the August arrest and claimed that Danielle was threatening to lie to the police and file a false police report. He testified he did not follow Danielle in

---

[2] Rebuttal evidence was presented about an attack by Butler on a couple in November 2008, but it need not be summarized here.

11

his car on September 30. By then, he had a new girlfriend and had moved on from Danielle and past relationships.

Butler testified that Danielle texted him "out of the blue" on October 13. Although he was already in his new relationship and had decided to move on, he still had feelings for Danielle. Two days later, he and Danielle talked on the phone for about two hours. When he told Danielle about his new girlfriend, who was out of town, Danielle got upset that he had replaced her and she came to his apartment around 2:00 or 3:00 a.m. They got along well and had consensual sex. Danielle told him there was nobody like him among other men, and she wanted to "wait" for him until after his upcoming sentence was over (for dissuading a witness).

The next day they were happy to be together and went to a restaurant and several bars, and both of them had a number of drinks (beer and gin and tonics). They were both drunk but able to talk about and plan on having anal sex at the park, which they had done before a few times. At the restaurant where they went to eat dinner, they discussed infidelity, but without arguing about it. Butler understood that he and Danielle had cheated on each other, but testified that this did not upset him, because that was the type of women that he dated, so he wasn't surprised.

Butler testified that when he and Danielle left the restaurant, they strolled back toward his apartment, taking in the night air, although they stumbled a bit because they were drunk. They were still planning to drive together in Danielle's car to the nearby park to have sex, because Butler's roommate might be at home and he did not approve of their relationship. When they got to the car, Danielle voluntarily performed oral sex on

him.  They found that the park was barricaded so they parked the car nearby, and Danielle went into the back seat and undressed.  They continued the oral copulation and then they moved around to have anal sex, while she encouraged him.  Butler testified that throughout the episode, he did not beat, punch, kick or push Danielle down, and he did not have his knife with him.

Afterwards, they got dressed and moved around in the car.  Danielle didn't want to go home, even though she knew Butler's new girlfriend was coming back to him the next day.  Butler and Danielle were both upset and frustrated about the way the day was going, and they argued about the new girlfriend.  Butler heard a click, which he recognized as the sound of Danielle's knife opening, and she lunged at him with the knife.  He was surprised and afraid because he had taught Danielle where to stab a person to kill him, and he thought she would do so.  As he had been trained to do, he lunged at Danielle to disarm her, reaching for her wrist and hand and using his head and weight to pin her into the back seat.  He bent and twisted her wrist, probably breaking it, then hit her in the chest a few times as "softening blows," for distraction.  When he pulled Danielle's arm toward her body and twisted her wrist, he felt the blade "slide into her back" and saw that she arched up her back, causing the knife to drop out, so he put it in his pocket.

They then got out of the car and walked toward the park.  Butler could see that Danielle's arm was hurt, but he did not seek medical help, since he knew he was violating the restraining order, they had just had a fight, and Danielle had a stab wound in her back.  They were both stumbling and he held Danielle by the arm.  When Butler noticed a neighbor was watching them, he was afraid that the noise of the fight had been heard

13

from the car, so he decided to get away from the car. Danielle then slapped him and he pushed her to the ground. When he bent down to pick her up, she kicked him in the mouth. He kicked her about six more times, then picked her up, told her to stop because she was being unreasonable, and they went back toward the car.

Once Danielle ran away to the neighbor's house, saying that Butler was going to kill her, Butler decided he needed to "fix this," because it did not "look good." When he knocked on Lawrence's door, no one answered, so he walked back to his house. He then drove his truck to Oceanside to visit his girlfriend, where he was arrested a few days later.

In his testimony, Butler denied forcing Danielle to orally copulate him, and denied that any forcible sodomy took place, as she had agreed to all their sexual conduct. He did not intend to stab her in the back. Discussing infidelity with either his ex-wife or Danielle did not upset him.

The trial court took judicial notice of the protective order issued on July 18, 2011, prohibiting Butler from all contact with Danielle and requiring that he stay 100 yards away, and admitted the document into evidence. Butler's felony conviction of September 8, 2011, for dissuading a witness from reporting a crime was also judicially noticed and admitted into evidence. (§ 136.1, subd. (b)(1).) The document showed that Butler was out on bail, awaiting sentencing, at the time of the October 2011 incidents.

The court held a series of jury instruction discussions, and Butler's counsel explained he was in a "delicate position" about the problem of proposing lesser included offense instructions, due to his concerns the jury might then enter into some kind of

14

compromise.  The prosecutor withdrew that proposed instruction.  After doing some more research over the weekend, the court decided that no instructions on the lesser included offenses of attempted involuntary manslaughter would be appropriate, because no evidence supported them.

Before the case was submitted to the jury, one of the jurors notified the court he had received a Facebook advertisement about a criminal background check business that had a mug shot photo that looked somewhat like Butler.  The court questioned all of the jurors about it, then denied Butler's request for a mistrial.  Later, a new trial request on the same ground, and others, was denied.

During deliberations, the jury sent out notes requesting that several portions of the testimony be read back, but changed its request to hear only Butler's account.  Ultimately, the jury convicted Butler on all four counts, but did not find true that he had used a knife during the kidnapping or sex offenses, nor did he inflict great bodily injury, except in the forcible sodomy and the attempted murder.  Sentencing took place, as described above, and Butler appeals.

I

*SUA SPONTE INSTRUCTIONS:  LESSER INCLUDED OFFENSE*

A.  Standards of Review and Issues Presented

Butler claims the trial court erred by instructing the jury on the attempted murder count, without adding, sua sponte, instructions on the lesser included offense of attempted voluntary manslaughter.  He argues his rights were not fully protected, to have the jury determine every material issue presented by the evidence, including his theories

15

of " 'sudden quarrel or heat of passion' (§ 192, subd. (a))," or his "unreasonable but good faith belief in having to act in self-defense."  (*People v. Barton* (1995) 12 Cal.4th 186, 198-199 (*Barton*); *People v. Cunningham* (2001) 25 Cal.4th 926, 1007-1009 (*Cunningham*).)

In criminal cases, " ' "even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence.  [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." ' "  (*Breverman*, *supra*, 19 Cal.4th at p. 154.)  In this context, substantial evidence means evidence from which a reasonable jury could conclude the defendant committed the lesser offense, instead of the greater one.  (*Id.* at p. 162.)  In deciding if there is substantial evidence of a lesser offense, however, the courts will not evaluate the credibility of witnesses, which is the jury's prerogative.  (*Ibid*.)  On review in this context, we construe the evidence in the light most favorable to the appellant.  (*People v. Turk* (2008) 164 Cal.App.4th 1361, 1368, fn. 5.)

B.  Lesser Included Offense of Attempted Voluntary Manslaughter

In *Breverman*, *supra*, 19 Cal.4th at pp. 153-154, the court set out the distinctions between murder (the unlawful killing of a human being with malice aforethought, § 187, subd. (a)), and voluntary manslaughter (§ 192), where a defendant has killed intentionally and unlawfully, but without malice.  (*Breverman*, at p. 153; *Barton*, *supra*, 12 Cal.4th at p. 199.)  "But a defendant who intentionally and unlawfully kills *lacks malice* . . . in limited, explicitly defined circumstances: either when the defendant acts in a 'sudden

16

quarrel or heat of passion' (§ 192, subd. (a)), or when the defendant kills in 'unreasonable self-defense'—the unreasonable but good faith belief in having to act in self-defense." (*Barton*, at p. 199; italics added.)

The jury was instructed that the People were required to prove that Butler took at least one direct but ineffective act toward accomplishing attempted murder, and that he intended to kill Danielle. (CALCRIM No. 600.) Such "intent or intention is manifested by the circumstances connected with the offense." (§ 29.2, subd. (a).) The court further instructed the jury about how to complete its verdict forms, including those for any lesser included offenses that it concluded had been proven by the evidence. These included forms of kidnapping, false imprisonment, and assault. If the jury was not persuaded by the evidence that Butler was guilty beyond a reasonable doubt, it must find him not guilty.

During several court sessions the court thoroughly discussed the proposed instructions with counsel, and inquired whether an instruction was being pursued to state that attempted voluntary manslaughter was the only lesser included offense for attempted murder. Although the prosecutor had requested such an instruction, she withdrew it. Defense counsel told the court that in light of the defense being presented, that Butler had acted in self-defense, a lesser included offense instruction would put the defense in a "very delicate situation," and he was reluctant to give the jury that option of "split[ting] the baby [in half]" (e.g., convicting on a lesser offense instead of acquitting). The court concluded that no instruction on attempted voluntary manslaughter would be given,

17

because there were no facts to support it, and "I don't believe there's any evidence to support that."  Defense counsel agreed.

C.  Contentions and Analysis:  Provocation and Heat of Passion

On Butler's contention that the sequence of events proven at trial does not demonstrate the required element of malice, we next examine the record for substantial support in the evidence of his claimed extreme provocation by Danielle.  (*People v. Rogers* (2006) 39 Cal.4th 826, 866-867.)  Some levels of provocation can cause a person to take actions out of a heat of passion, not out of reflective judgment.  (*Le*, *supra*, 158 Cal.App.4th at p. 525; *People v. Berry* (1976) 18 Cal.3d 509, 515; *People v. Borchers* (1958) 50 Cal.2d 321.)  In this context of intimate partner violence, such "provocative conduct may be physical or verbal, and it may comprise a single incident or numerous incidents over a period of time."  (*Le*, at p. 528.)  " 'The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim.' "  (*Ibid.*; *Berry*, at pp. 515-516.)

Butler thus argues the evidence showed the unlawful attempted killing might constitute voluntary manslaughter, such as "if the killer's reason was actually obscured as the result of a strong passion aroused by a 'provocation' sufficient to cause an " ' "ordinary [person] of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than from judgment." ' "  (*Breverman*, *supra*, 19 Cal.4th at p. 163.)

18

Butler points to the evidence in the record that his relationship with Danielle had been tumultuous for about a year, including violence, and that she acknowledged that when the topic of infidelity came up, they often argued and fought. Danielle nevertheless kept up this roller coaster relationship with Butler and initiated contact several times, including October 2011. She ignored the July 2011 criminal protective order that prohibited Butler from contacting her, and thus seemed to become accustomed to being beaten by him. According to Butler, she had recently enticed him into sexual situations by coming over to his home to spend the night, and recently sent him suggestive nude photos of herself. He points out that he and Danielle had been getting along well the day of the incident, until they suddenly started fighting about her infidelity while waiting for dinner. Butler thus argues that both objectively and subjectively speaking, he showed to the jury that he was likely provoked by such interactions into attacking Danielle in a heat of passion.

We disagree. Even viewing the evidence in the light most favorable to the defendant, we cannot say there was enough evidence of actual provocation by Danielle to send to the jury, for consideration whether such a heat of passion defense was tenable. Unlike in *Le*, *supra*, 158 Cal.App.4th at p. 529, this was not a long term relationship or marriage in which a spouse used her affair with a third party as a tool to humiliate the other spouse and to create a taunting event that "simply served as the spark that caused this powder keg of accumulated provocation to explode." (*Ibid.*) Rather, the evidence showed that Butler understood that the type of women he dated were prone to cheating on him, and he in turn consistently cheated on his girlfriends. The evidence about ongoing

19

infidelity in the relationship does not support any finding that Butler's acts of violence on this date arose out of that type of provocation. (*Cunningham*, *supra*, 25 Cal.4th at p. 1009.)

To assert this ground of instruction, the evidence need not show any specific type of provocation, and "the passion aroused need not be anger or rage, but can be any " ' " '[v]iolent, intense, high-wrought or enthusiastic emotion' " ' [citations] other than revenge." (*Breverman*, *supra*, 19 Cal.4th at p. 163.) When they left the restaurant, Danielle thought Butler seemed "enraged" while they walked into the alley. Even though he had angry exchanges with Danielle on the day of this incident, Butler has raised no evidence to show that his attacks on her were in reaction to any identifiable provocative words or actions that directly precipitated his conduct. Even when describing how she lunged at him with a knife, Butler's version was that he kept his head and defended himself according to his training.

Finally, we note that during jury instruction discussions, Butler's counsel did not object when the prosecutor withdrew the instruction on the lesser included offenses of attempted voluntary manslaughter, or when the court decided not to give it. The evidence simply did not justify a conviction of such a lesser offense, with respect to any provocation or instigation by Danielle. (*Breverman*, *supra*, 19 Cal.4th at pp. 153-154; *Cunningham*, *supra*, 25 Cal.4th at pp. 1007-1008.)

D. Additional Rules on Imperfect Self-defense; Negation of Malice

"[I]mperfect self-defense is not a true defense; it is rather 'a shorthand description' of one form of the crime of voluntary manslaughter. [Citation.] Thus, a trial court's duty

to instruct on this theory arises 'whenever the evidence is such that a jury could reasonably conclude that the defendant killed the victim in the unreasonable but good faith belief in having to act in self-defense.' " (*Rogers*, *supra*, 39 Cal.4th at p. 883, citing *Barton*, *supra*, 12 Cal.4th at p. 201.)

The doctrine of imperfect self-defense is a narrow one, that will apply "only when the defendant has an actual belief in the need for self-defense and only when the defendant fears immediate harm that ' " 'must be instantly dealt with.' " ' " (*Rogers*, *supra*, 39 Cal.4th at p. 883.) If the defendant can show his " 'honest but unreasonable belief that it is necessary to defend [himself] from imminent peril to life or great bodily injury,' " he is entitled to a conclusion that no malice existed, and the charged offense is reduced to manslaughter. (*Ibid.*)

Here, the trial court instructed the jury on the doctrine of justifiable self-defense, and stated the People had the burden of proving beyond a reasonable doubt that Butler did not act in self-defense. The court explained to the jury that it could find Butler had acted lawfully if he acted in self-defense in stabbing Danielle, if he reasonably believed he was in imminent danger of suffering bodily injury, and if he reasonably believed that the immediate use of force was necessary to defend against that danger, and if he used no more force than was reasonably necessary to defend against the danger.

These instructions also told the jury, "If the defendant used more force than was reasonable, the defendant did not act in lawful self-defense. [¶] When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a

21

similar situation with similar knowledge would have believed."  Further, the jury was instructed that a person does not have a right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force.  The instructions next stated that the right to use force in self-defense will continue only as long as the danger exists or reasonably attempts to exist, or while the attacker appears capable of inflicting injury.

### E.  Contentions and Analysis

According to Butler, the sequence of events proven at trial does not demonstrate the required element of malice for the attempted murder charge, because of his reasonably formed and honest, but mistaken, belief that he needed to defend himself from Danielle's immediate threat to his bodily integrity and his life.  (*Rogers*, *supra*, 39 Cal.4th at p. 883.)  The jury rejected his claim of actual self-defense, but he continues to argue that he could have been reasonably mistaken about the need to defend himself.  For example, he points out that Danielle is smaller and weaker than he is, and he was highly trained in the martial arts and probably should have been readily able to fight her off, but he mistakenly went on to resist her, taking her knife away, and then felt the knife go in her back.

This record does not show substantial evidentiary support that Butler could have been reasonably misled by Danielle's offensive, aggressive actions toward him that day in the car, to cause him to mistakenly conclude that he had to defend himself.  Danielle testified that she did not carry the knife he had given her, but that Butler had a knife that day.  Although Butler told the jury he taught Danielle how to use a knife, and feared that she would fatally stab him, such testimony did not support a theory of imperfect self-

22

defense. He has brought forward no evidence to support his appellate contention that he was somehow mistaken into believing that Danielle's physical condition, actions and circumstances posed a credible threat to his life and well-being, and this caused him to use the knife on her. There was no substantial evidence from which the jury could have concluded he tried to kill Danielle "due to an honest but unreasonable belief that he needed to defend himself from an imminent threat to his life or to his bodily integrity." (*Rogers*, *supra*, 39 Cal.4th at p. 883.)

Again we note that during jury instruction discussions, the court stated it would not instruct on attempted voluntary manslaughter because there was no evidence in support of that charge. Butler was pursuing a different approach, by claiming true self-defense. No sua sponte instructional duty arose in this respect.

II

*SUA SPONTE INSTRUCTION:  DEFENSE OF MISTAKEN BELIEF OF CONSENT*

The jury instructions given by the trial court included CALCRIM Nos. 1015 and 1030 on the People's obligation to prove that the charged sexual acts had occurred, without the free and voluntary consent of the victim, who knew the nature of the act. The instruction stated, "Evidence that the defendant and the person dated is not enough by itself to constitute consent." Additionally, the trial court instructed the jury that it could consider the evidence that Danielle had previously had consensual sexual intercourse with Butler, but only to help it decide whether she had consented to the charged acts, and whether Butler reasonably and in good faith believed that she consented in that way.

23

Counsel for Butler argued to the jury that Butler had an actual and reasonable belief that Danielle had consented to the sexual acts that occurred, which provided him the defense of actual consent to the charges of forcible oral copulation and sodomy. On appeal, Butler argues the trial court violated his constitutional right to fully present his defense that he mistakenly believed Danielle had consented to their sexual activity, since the court did not give a *Mayberry* instruction, sua sponte (*Mayberry*, *supra*, 15 Cal.3d at pp. 153-158). The focus of such an instruction is to guide the jury's consideration of any existing "*substantial evidence* that the defendant honestly and reasonably, *but mistakenly*, believed that the victim consented to sexual intercourse." (*Williams*, *supra*, 4 Cal.4th at p. 361, italics added.)

## A. Applicable Standards

Generally, a sua sponte instruction on a defense must be supported by substantial evidence and may not be inconsistent with the defendant's theory of the case. (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047.) A trial court must give such a consent instruction sua sponte "only when the defense is supported by 'substantial evidence,' that is, evidence sufficient to 'deserve consideration by the jury,' *not 'whenever any evidence is presented, no matter how weak*.' " (*Williams*, *supra*, 4 Cal.4th at pp. 360-361.)

This *Mayberry* defense "has two components, one subjective, and one objective. The subjective component asks whether the defendant honestly and in good faith, albeit mistakenly, believed that the victim consented . . . . In order to satisfy this component, a defendant must adduce evidence of *the victim's equivocal conduct* on the basis of which he erroneously believed there was consent. [¶] In addition, the defendant must satisfy

24

the objective component, which asks whether the defendant's mistake regarding consent was reasonable under the circumstances. Thus, regardless of how strongly a defendant may subjectively believe a person has consented to sexual intercourse, that belief must be formed under circumstances society will tolerate as reasonable in order for the defendant to have adduced substantial evidence giving rise to a *Mayberry* instruction." (*Williams*, *supra*, 4 Cal.4th at pp. 360-361, fn. omitted; italics added.)

In *People v. Hernandez* (2009) 180 Cal.App.4th 337, 345-346, this court explained that even if a defendant can bring forward facts of the victim's equivocal conduct that supported his claim he subjectively believed she had consented to sexual conduct, those facts that are arguably equivocal "must be viewed in the context of the circumstances surrounding the conduct he described." There, the objective portion of the test could not be satisfied to support instructions on a theory of consent, because the record showed the defendant had broken into the victim's home, in the early hours of the morning, carrying and showing a two-foot long metal bar, thrown her phones out of reach, told her he had killed a policeman, and he "gave her 10 minutes to give in to his demands for sex or 'something bad was going to happen.' " (*Hernandez*, at p. 345.) Also, the victim was attempting to protect her baby when she stopped physically resisting his demands, and only after the defendant threatened her with " ' "force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another." ' " (*Ibid.*, citing *Williams*, *supra*, 4 Cal.4th at p. 364.) This court found it was not error for the trial court to omit instructions about the victim's supposed consent, because the objective standard for the defendant's reasonable reliance on her conduct was not met. Thus, "it was

25

unreasonable as a matter of law for Hernandez to believe the victim consented to sexual intercourse." (*Hernandez*, at pp. 345-346.)

### B. Contentions and Analysis

According to Butler, the sequence of events proven at trial is consistent with his theory that if Danielle did not actually consent to the oral copulation and sodomy incidents, he mistakenly believed that she did so. The evidence showed that for over a year, their relationship had included breakups, reconciliations, and incidents of violence, but Danielle was not deterred from associating with him. He thus argues she displayed "equivocal conduct that could be reasonably and in good faith relied on to form a mistaken belief of consent, despite the alleged temporal context in which that equivocal conduct occurred." (*Williams*, *supra*, 4 Cal.4th at p. 364; *Hernandez*, *supra*, 180 Cal.App.4th at pp. 345-346.) This might satisfy the subjective component required to justify presentation of this defense.

On the objective portion of the test, Butler points out that the jury did not find true the weapons use enhancements on the sex offenses, and thus the jury did not believe Danielle's testimony that he had the knife in his lap while the oral copulation was going on. In *Williams*, the court acknowledged that in such situations, a jury might believe parts of the defendant's version of events and also parts of the victim's version. (*Williams*, *supra*, 4 Cal.4th at p. 364.) Thus, Butler contends all the evidence would have justified submitting "the full issue of consent to the jury for determination," such as whether he was led into mistake and formed a reasonable belief of her consent.

26

When we view Danielle's "equivocal" conduct, we do so "in the context of the circumstances surrounding the conduct [defendant] described." (*Hernandez*, *supra*, 180 Cal.App.4th at pp. 345-346.) Whether or not Butler *subjectively* believed that Danielle consented to sexual conduct that day, the circumstances of how they got to the car, where the conduct occurred, do not satisfy the *objective* component of the *Williams* analysis. (*Ibid.*) Butler suddenly got angry with Danielle in the restaurant, told her she was not going to have a good night, marched her to an alley where he beat her, then marched her back to the car while beating her some more, then forced her into the car. Although they had participated in consensual sex approximately 12 hours earlier, those intervening circumstances must be considered in evaluating whether Butler could have formed a reasonable but mistaken belief, based upon the history of their relationship, that she consented to these acts that day in the car. The objective component of the *Williams* analysis is not satisfied here. This proposed defense of mistake is unsupported by any substantial evidence in the record.

The trial court would have had no justification for giving a sua sponte instruction on a possible mistaken but reasonable belief in Danielle's consent to the sexual conduct. Butler did not carry his burden to present evidence raising a reasonable doubt about an objectively reasonable but mistaken belief that he was not forcing sex.

Because we have found no error occurred on either this ground or a lesser included offense instruction, we need not reach Butler's arguments about the application of harmless error theory or federal constitutional standards for evaluating such error. (*People v. Watson* (1956) 46 Cal.2d 818, 836; *Chapman v. California* (1967) 386 U.S. 18, 24.)

*INVESTIGATION INTO POTENTIAL JUROR MISCONDUCT*

Butler contends the trial court did not carry out an adequate investigation of potential juror misconduct, when a juror notified the court he had received an advertisement for a criminal background check service on his Facebook page, during trial. Butler requested a mistrial and brought a motion for new trial on the same ground, which the court denied. On appeal, we examine the trial court's rulings on the issue for any abuse of discretion. (*Virgil*, *supra*, 51 Cal.4th at p. 1284.)

" ' "When a trial court is aware of possible juror misconduct, the court 'must "make whatever inquiry is reasonably necessary" ' to resolve the matter." [Citation.] Although courts should promptly investigate allegations of juror misconduct "to nip the problem in the bud" [Citation], they have considerable discretion in determining how to conduct the investigation.' [Citation.] . . . The court does not abuse its discretion simply because it fails to investigate any and all new information obtained about a juror during trial." (*Virgil*, *supra*, 51 Cal.4th at p. 1284; *People v. Ray* (1996) 13 Cal.4th 313, 343 (*Ray*).) The courts will not reach issues of prejudice unless jury misconduct is found. (*People v. Collins* (2010) 49 Cal.4th 175, 242.)

## A. Facts on Investigation

At the outset of trial and when the case was submitted to it, the jurors were instructed in the language of CALCRIM No. 201 about their duty not to use the Internet or a dictionary in any way in connection with the case. Also, they were told under CALCRIM No. 200, in relevant part: "You must decide what the facts are. It is up to all

28

of you, and you alone, to decide what happened, based only on the evidence that has been presented to you in this trial."

At trial, since Butler was charged with committing the crimes while released on bail, he did not oppose informing the jury that he had a prior criminal conviction. The court took judicial notice of that prior felony conviction, and it was admitted into evidence.

During trial, Juror No. 11 sent a note to the court stating he had received a Facebook advertisement about a criminal background check business, and it had a mug shot photo that looked somewhat like Butler. The court brought the juror into chambers to question him individually. Juror No. 11 explained there were no names on the post and he could not tell who sent it to him. It appeared to be an advertisement for a company called "United States Background Checks," and it offered criminal background checks on all criminals in a given area. It was illustrated with a photo that looked like Butler. Although Juror No. 11 ignored the post, he thought it was kind of strange and was concerned enough to notify the court he had received it. When asked, he said that he could set aside any consideration of that post and make his decision based on the evidence presented in the courtroom.

Butler's attorney moved for a mistrial, on the grounds that another juror might have sent the information to Juror No. 11, or he might have been researching the case on his own. The prosecutor stated that the jury had already been told that Butler was out on bail when these incidents occurred. In response, the court called all the jurors in separately, and asked whether they had been communicating through e-mail or Facebook

with each other, and they each answered no. The court found no basis to conclude any of the other jurors had communicated with Juror No. 11 in that manner, and no prejudice to Butler had arisen. The court denied the motion for mistrial.

Later, Butler filed a new trial request on the same ground, and others. He supplied additional information about the wide availability of such unsolicited criminal background check services and advertisements on the Internet. The prosecutor inquired of the arresting authorities whether they had released any mug shots of Butler to such services, and they said no. The motion was denied.

## B. Contentions and Analysis

Butler contends his motion for mistrial should have been granted because the trial court did not conduct an adequate investigation into the juror's activities, thus abusing its discretion, such as when it did not accept the juror's offer to show the judge his Facebook page. Defense counsel's new trial motion attached material retrieved from the Internet about the advertised Web site, showing it listed several court index links, warrant links, and arrest links. Butler thus argues this information made it appear to Juror No. 11 that Butler "had a long and extensive criminal record, far more than the jury was told."

The jurors were made aware of the restrictions on their use of the Internet or other sources to research matters in connection with the case. Juror No. 11 conscientiously reported the matter in court, and he told the judge he could set aside any consideration of the posted advertisement and would make his decision based on the evidence presented in the courtroom.

Only speculative concerns were raised by defense counsel. In response, the court questioned not only Juror No. 11 but also all the other jurors, and evaluated their responses. No evidence was produced to support defense counsel's contention that this juror might have done anything improper or inappropriately communicated with other jurors. There was no indication any of the jurors had violated the court's instructions or committed misconduct of any kind. (*Virgil*, *supra*, 51 Cal.4th at p. 1284; *Ray*, *supra*, 13 Cal.4th at p. 343.)

On this record, the trial court had an adequate basis to conclude that the purported misconduct did not require any further investigation. "[A] hearing is required only where the court possesses information which, if proven to be true, would constitute 'good cause' to doubt a juror's ability to perform his duties and would justify his removal from the case." (*Ray*, *supra*, 13 Cal.4th at p. 343.) The trial court did not err or abuse its discretion in denying the defense's motion for mistrial or a new trial.

## DISPOSITION

The judgment is affirmed.

HUFFMAN, Acting P. J.

WE CONCUR:

McINTYRE, J.

AARON, J.

31