Filed 7/15/22 P. v. Perriera CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C091107 |
| Plaintiff and Respondent, | (Super. Ct. No. STK-CR-FECOD-2018-0011054) |
| v. | |
| BRANDON MICHAEL PERRIERA, | |
| Defendant and Appellant. | |

In 2018, defendant Brandon Michael Perriera stabbed his estranged wife's boyfriend multiple times, killing him.[1]  A jury found him guilty of first degree murder

---

[1] Throughout the record, defendant's surname is sometimes spelled "Perriera," including on the information, fingerprint form, and abstract of judgment.  However, other portions of the record, including the verdict form, probation report, and notice of appeal, spell defendant's surname as "Perreira," and defendant's opening brief indicates that "Perreira" is the correct spelling.  Because it is not clear from the record, we shall direct the trial court to verify the proper spelling and amend the abstract of judgment accordingly.  In this opinion, we utilize "Perriera," which is the spelling that appears on the abstract of judgment.

1

with the personal use of a knife, and he was sentenced to an aggregate term of 26 years to life in state prison.

On appeal, defendant contends: (1) the trial court erred by failing to adequately respond to the jury's question about whether the person who provoked a defendant for purposes of reducing a first degree murder conviction to a lesser charge had to be the homicide victim; (2) evidence and the prosecutor's argument supported a third party provocation defense thus making the court's inadequate response regarding provocation prejudicial; (3) his trial counsel rendered ineffective assistance by not objecting to the court's response to the jury's question regarding provocation; (4) the trial court failed to define the term "provocation"; (5) his trial counsel was ineffective for failing to request a modification or clarification of the term provocation; and (6) the trial court erred in calculating his custody credits.

We agree with defendant's latter contention that the court erred in awarding custody credits, and we shall modify the judgment accordingly. We shall reject defendant's remaining contentions and affirm the judgment as modified regarding credits.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant and Virginia Perriera[2] were married and shared a young daughter together.[3] They had a tumultuous, on-again off-again relationship. They lived together in an RV park next to the victim, Darren Jopp. Defendant eventually moved out of the RV park. By July 2018, Virginia was dating Jopp. Jopp sometimes watched her daughter, whom he treated like his own child.

---

[2] Because defendant and Virginia share the same surname, we refer to her by her first name.

[3] Defendant's daughter was born in September 2015, and was almost three years old at the time of the incident.

On July 3, 2018, defendant and Virginia had several profanity-laced phone calls during which defendant expressed his anger over Virginia hanging out with Jopp, and about how their daughter loved Jopp and not defendant.[4] Defendant told Virginia he was heartbroken, and was "gonna go crazy . . . ."

On July 4, 2018, defendant and Virginia took their daughter to a family friend's house to watch the fireworks. They left separately around 11:00 p.m. Sometime around then, Virginia called defendant several times, and he cursed at her to stop calling him. Defendant told Virginia she should hang out with Jopp because he was "gonna be dead in a couple of days." He also stated, "I ain't fucking playing you know what I mean? I'm fucking done with this shit dude, like, you obviously fucking you know what I mean? So enjoy that mother fucker while he's there, you [know] what I mean, cause he's not gonna be there for very long. You think I'm playing?" In a subsequent call, defendant told Virginia he was on his way to burn Jopp's trailer down, and that she should let him know.

Virginia called Jopp to warn him that defendant was drunk and threatening to burn Jopp's trailer. She told Jopp to be on the lookout for defendant. She called Jopp back and warned him not to use his bow and arrow as it was for killing animals, and Jopp responded that "burning someone's trailer is killing someone."

Virginia called defendant again close to midnight telling him that he needed to "knock it off." Defendant replied that she was not going to play him as a fool, and he cursed that he would not care when Jopp "goes up" in flames. Defendant said that he knew Virginia had recorded all their calls, and threatened to kill her too if she turned him in.

---

[4] Officers recovered Virginia's phone, which she had left in her friend's mailbox after Jopp was killed. Virginia had an app on her phone that recorded all of her calls, and recordings of several of her calls with defendant and with Jopp were played for the jury.

3

Virginia called Jopp again in the early morning hours on July 5, and he reiterated that if defendant tried to get into his trailer that night, defendant was "gonna get an arrow in him" because Jopp was "not fucking around no more." At the time, Jopp was watching Virginia's daughter, and Virginia asked Jopp to save her baby if anything happened.

Sometime during the evening, Jopp told his friend, Gary Bischof, that he was having trouble with Virginia, and that her husband, defendant, had been drinking and had threatened to burn down his trailer. After speaking with Jopp, Bischof walked through the RV park looking for defendant's truck, but did not see it. Bischof saw that Jopp had a crossbow with him, which Bischof described as a powerful, deadly weapon. When Bischof returned to his home just outside the RV park gate, he noticed a small truck drive into the RV park on his security cameras and called to warn Jopp.

Jopp also told his neighbor, William Mefford, that "Brandon" was in the RV park, and that he said he was going to set Jopp's trailer on fire. Jopp appeared concerned about the threat, and was on the lookout.

About 3:30 a.m., Mefford heard a "ruckus" outside in the street near Jopp's trailer. He went outside and saw glass in the roadway as well as a flashlight, a broken crossbow that looked as it if had been run over, and a knife. Mefford did not see Jopp, but noticed there were people in his trailer. Shortly after he heard the commotion, he saw Virginia drive up with her daughter. Virginia got out of her car and picked up the knife and the crossbow; she placed the items in her car and drove away.

Around that same time, resident Meghan Blain watched a white Beetle that belonged to Virginia and a gold truck repeatedly drive in and out of the RV park at rapid speeds on her security cameras. Another resident, Diana Park, saw Jopp and defendant get into a light-colored pickup truck, and she heard Jopp yell, "We can handle this right now." Jopp got out and then defendant appeared to put the truck in reverse while Jopp

4

appeared to grab for something in the bed of the truck; Jopp rolled out of the way, and it appeared that he had been hit by the car. Park called 911 and the pickup truck sped away.

Neighbor Gilberto Hernandez spoke with Jopp earlier in the evening, and Jopp had told him that there was a problem and some guy was messing with him. Later, Hernandez saw Jopp walk to a brown truck that parked in front of Jopp's trailer; Hernandez did not see who was driving. Jopp approached the truck from behind and went to the driver's side window. Hernandez did not remember seeing Jopp with a crossbow, and he did not see any windows break on the truck, although he later saw a crossbow, knife, and arrow on the ground.[5] While he never saw Jopp get in the truck or the driver get out of the truck, the driver's side door was open and Jopp was hanging onto the car door. The driver put the truck in reverse and Jopp rolled on the ground. Hernandez then followed Jopp into his trailer and noticed his neck was injured.

Shortly thereafter, Hernandez alerted Blain that someone had cut Jopp's throat. Blain called 911 and went to Jopp's trailer where she found him in distress with his throat cut. She asked Jopp who had cut him and Jopp responded, "Brandon."[6]

San Joaquin County Sheriff's deputies were dispatched to the RV park around 3:30 a.m. When the deputies arrived around 20 minutes later, they found Jopp inside his trailer with Blain and her fiancé giving him first aid. Jopp had been stabbed multiple times, and he later died from his injuries.

---

[5] During an earlier police interview, Hernandez said he saw Jopp standing outside his trailer holding a crossbow, and that when Jopp saw the truck he immediately rushed out to the roadway carrying the crossbow. Hernandez said he also saw or heard a truck window break, but he was unsure how it shattered.

[6] When Blain first arrived at Jopp's trailer, she encountered Virginia and her daughter coming out the door. Virginia later returned to the trailer while Blain was trying to administer first aid to Jopp, and Blain asked her who Brandon was, but Virginia told her not to worry about it. A recording of Blain's 911 call in which Jopp can be heard saying that "Brandon" cut him was played for the jury.

After the incident, Virginia called defendant several times and yelled at him for stabbing Jopp. She threatened to report him to police. In later calls, Virginia told defendant the police were looking for him and that she had picked up the murder weapon. Defendant denied slashing Jopp's throat, and claimed Jopp had come at him with the crossbow.[7] Virginia suggested that they flee to Las Vegas. A short time later, defendant and Virginia fled the state with their daughter.

A few months later, on September 3, 2018, defendant and Virginia were apprehended in Missouri and arrested. Defendant was charged with first degree murder (Pen. Code, § 187, subd. (a))[8] with the personal use of a knife (§ 12022, subd. (b)(1)).[9]

In October 2019, a jury found defendant guilty as charged. In December 2019, the trial court sentenced him to an indeterminate term of 25 years to life for the murder plus one year for the knife enhancement. Defendant timely appealed.

## DISCUSSION

## I

### *Response to Jury Question*

Defendant contends the trial court prejudicially erred by providing an inadequate response to a jury question regarding provocation by someone other than the victim. In his view, the trial court should have instructed the jury that Virginia or defendant's young daughter could have been the direct source of the provocation while Jopp was the indirect

---

[7] Defendant also told Virginia's sister during a call that it was an accident, that he was not even looking when he stabbed Jopp, that he only jabbed him two times, but not in the throat, and that Jopp had shot a crossbow at his truck, breaking the window.

[8] Further undesignated statutory references are to the Penal Code.

[9] Both defendant and Virginia were charged with child abuse and endangerment (§ 273a, subd. (a)), and Virginia was charged with being an accessory after the fact (§ 32), and unlawfully taking or driving a vehicle (Veh. Code, § 10851, subd. (a)). Prior to trial, the child abuse and endangerment count was dismissed in the interest of justice.

6

source given his affair with Virginia and his close relationship with defendant's daughter. Recognizing that he did not object to the trial court's response to the jury's question, defendant alternatively argues that no objection was necessary and that his trial counsel was ineffective for failing to object.

*A.      Background*

During deliberations, the jury submitted a question asking, "Does the provoking person have to be the victim?" Before responding to the jury's question, the court met with counsel and informed them that "I've gone through the instructions looking for every reference to provoke. And I believe that it's [CALCRIM Nos. 522, 570], 3472, and CALJIC 5.55. . . . So those are the only ones that I believe have the word provoke or provocation. Let me ask the reporter to go through the instructions. And see if she can find provocation, provoked."

After rereading the jury's question at the prosecutor's behest, the court stated, "generally the answer would be to reduce a crime to -- to eliminate malice, we're focused on the acts of the victim as to how it affects the defendant. However . . . there is one instruction that says a person does not have the right to self-defense if he provokes a fight or quarrel with the intent to create an excuse . . . to use force. So I'll use all of them. . . . I'll see what they want, if they need any other explanation like that."

In the jury's presence, the court explained, "I've pulled the instructions that contain the word provocation or provoked. There are four of them. And I believe those are the only instructions that mention that. But if there's any other instruction that mentions it, of course, . . . those would be important instructions. But this is what I have found." The court informed the jurors that the instructions were CALCRIM Nos. 522, 570, 3472, and CALJIC No. 5.55. It then reread those instructions.

The trial court first reread CALCRIM No. 522 as follows: "[P]rovocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter. The weight and significance of the provocation, if any, are for you to

7

decide. If you conclude that the defendant committed murder, but was provoked, consider the provocation in deciding whether the crime was first or second-degree murder. Also, consider the provocation in deciding whether the defendant committed murder or manslaughter. So that does not talk about provocation by the defendant. That would be from someone else." The last two sentences are not part of the instruction, but comments by the court.

The court next reread CALCRIM No. 570, the voluntary manslaughter instruction, which explained in part the principle that "[a] killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion." The court reinstructed that "[t]he defendant killed someone because of a sudden quarrel or in the heat of passion if: One, the defendant was provoked; two, as a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; and, three, the provocation would have caused a person of average disposition to act rashly and without due deliberation, that is from passion rather than from judgment. [¶] . . . In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it."

The court further reinstructed that "[w]hile no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time. It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition in the same situation and knowing the same facts would have reacted from passion rather than from judgment. If enough time passed between the provocation and the killing for a person of average disposition to cool off and regain his clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis. [¶]

8

The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder."

The court then reread CALCRIM No. 3472 as follows: "A person does not have the right to self-defense if he provokes a fight or quarrel with the intent to create an excuse to use force." The court also commented, "So this is aimed at the defendant."

Finally, the court reread CALJIC No. 5.55, stating that "a person who contrives to start a fist fight or provoke a non-deadly quarrel does not forfeit the right to self-defense if his opponent responds in a sudden and deadly counter assault, that is force that is excessive under the circumstances. The party victimized by the excessive force need not withdraw and may use only reasonable necessary force in lawful self-defense."

After rereading the instructions, the court asked the foreperson, "Does that answer the question?" The foreperson replied, "Yes, sir." Neither counsel objected to the court's response to the jury's question or asked for further clarification from the court.

B.    Forfeiture

A trial court "is under a general obligation to 'clear up any instructional confusion expressed by the jury.' " (*People v. Dykes* (2009) 46 Cal.4th 731, 802; § 1138 ["After the jury have retired for deliberation . . . if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."].) But " '[w]here . . . the original instructions are themselves full and complete, the court has discretion . . . to determine what additional explanations are sufficient to satisfy the jury's request for information.' " (*Dykes,* at p. 802.) "When the trial court responds to a question from a deliberating jury with a generally correct and pertinent statement of the law, a party who believes the court's response should be modified or clarified must make a contemporaneous request to that effect." (*Ibid.*)

9

"[F]ailure to object to the trial court's wording or to request clarification results in forfeiture of the claim on appeal." (*Ibid.*)

Here, the trial court properly instructed the jury with each of the jury instructions addressing the concept of provocation as it related to murder and manslaughter. (*People v. Jones* (2014) 223 Cal.App.4th 995, 999-1001 [finding CALCRIM Nos. 520, 521, 522, & 570 correctly instructed the jury on degrees of murder and reducing first degree murder to second degree or voluntary manslaughter].) After deciding to reread the instructions previously given, the court specifically asked the jury foreperson if the response adequately addressed the jury's question, and the jury foreperson responded that it had. At no time did defense counsel object to the court's response or otherwise make a contemporaneous request to modify or clarify the response. Defendant has forfeited the issue.

In an attempt to avoid forfeiture, defendant argues that no objection was required because the original instructions were not complete because they did not adequately define provocation and did not answer the jury's question. Neither contention has merit.

"Although trial courts, generally, have a duty to define technical terms that have meanings peculiar to the law, there is no duty to clarify, amplify, or otherwise instruct on commonly understood words or terms used in statutes or jury instructions." (*People v. Griffin* (2004) 33 Cal.4th 1015, 1022.) " 'When a word or phrase " 'is commonly understood by those familiar with the English language and is not used in a technical sense peculiar to the law, the court is not required to give an instruction as to its meaning in the absence of a request.' " [Citations.] A word or phrase having a technical, legal meaning requiring clarification by the court is one that has a definition that *differs* from its nonlegal meaning. [Citation.]' " (*Id.* at pp. 1022-1023.)

In *People v. Cole* (2004) 33 Cal.4th 1158, at pages 1217-1218 (*Cole*), our Supreme Court found that provocation, for purposes of reducing the degree of murder, has its ordinary, nontechnical meaning. There, as here, the trial court instructed that the

10

jury could consider evidence of provocation as bearing on whether the murder was first or second degree. (*Id.* at p. 1217.) It also instructed that heat of passion could negate deliberation. (*Ibid.*) The defendant in *Cole* argued that once the trial court gave such instructions, it also had a duty to define provocation and heat of passion as they related to voluntary manslaughter. (*Ibid.*) The Supreme Court rejected this argument, finding that the defendant was not entitled to a voluntary manslaughter instruction and that "[p]rovocation and heat of passion as used in the instructions here bore their common meaning, which required no further explanation in the absence of a specific request." (*Id.* at pp. 1217-1218; see also *People v. Souza* (2012) 54 Cal.4th 90, 118; *People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1332-1334 (*Hernandez*); *id.* at p. 1334 [provocation as used in CALCRIM No. 522 "was not used in a technical sense peculiar to the law"; "[p]rovocation means 'something that provokes, arouses, or stimulates'; provoke means 'to arouse to a feeling or action[;] . . . to incite to anger,' " citing Merriam-Webster's Collegiate Dict. (10th ed. 2001) p. 938].)

Like in *Cole* and *Hernandez,* we conclude that the term "provocation" as used in the murder and manslaughter instructions here did not have a technical meaning that differed from its ordinary meaning. According to the Oxford English Dictionary, the term provocation includes, among other things, "The action of provoking or exciting anger, resentment, or irritation, esp. deliberately; action, speech, etc., that provokes strong emotion; an instance of this." (Oxford English Dict. Online (3d ed. Mar. 2022) <https://oed.com/view/Entry/153509?redirectedFrom=provocation> [as of June 23, 2022], archived at <https://perma.cc/EBF3-2E6C>.) Alternatively, it also defines it as: "A cause of irritation, anger, or resentment." (*Ibid.*) These definitions include a resulting mental state, of the very sort likely to interfere with premeditation and deliberation or cause a reasonable person to act rashly as a result of passion rather than from judgment. Thus, contrary to defendant's contention, the instructions as given did sufficiently focus

11

on defendant's state of mind, and a further definition of provocation was not necessary, nor could the failure to give such an instruction violate defendant's substantial rights.

The record also belies defendant's argument that the court's response did not answer the jury's question. The court specifically asked the jury foreman if the response given answered the jury's question, and the foreperson confirmed that it did. Had any confusion remained, the jury foreperson easily could have informed the court that further clarification was needed, but the foreperson did not.

We conclude the trial court's decision to reread the original instructions regarding provocation satisfied its instructional duty, and it was not required to further define provocation.[10]

## C.     *Ineffective Assistance of Counsel*

Defendant alternatively argues that his trial counsel rendered ineffective assistance of counsel by failing to object to the court's response to the jury's question.

" ' "To establish ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance was prejudicial, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant. [Citation.] 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " ' " (*People v. Rices* (2017) 4 Cal.5th 49, 80.)

---

[10] Defendant claims that the trial court's purportedly erroneous response to the jury's question regarding provocation requires reversal under the United States and California Constitutions. This point fails because, as we have concluded, the court's decision not to provide the jury with a technical definition of provocation as opposed to its ordinary meaning was not erroneous. And, the court's chosen response, according to the jury foreperson, satisfactorily answered the jury's question.

As previously discussed, a trial court is not required to instruct on the meaning of a term that is commonly understood, in the absence of a request. (*Cole, supra,* 33 Cal.4th at pp. 1217-1218.) A court also is not required to instruct on the meaning of a term that is commonly understood, *even on request.* (See e.g., *People v. Malone* (1988) 47 Cal.3d 1, 55 [trial court did not err in refusing defendant's requested instruction to define "aggravation" and "mitigation," which were commonly understood terms, even if defendant's proposed definitions would have provided a " 'helpful framework' " for the jury's consideration of the statutory circumstances in aggravation and mitigation].) In the context of reducing a murder from first to second degree, provocation has its commonly understood meaning. (*Cole*, at pp. 1217-1218.) The same common meaning, we believe, also applies in the context of reducing a murder to manslaughter. The common understanding in both contexts is that something arouses a person's emotions and causes them to act out in anger. (*People v. Ward* (2005) 36 Cal.4th 186, 215 ["The evidentiary premise of a provocation defense is the defendant's emotional reaction to the conduct of another, which emotion may negate a requisite mental state."].) Thus, even if defense counsel had asked the trial court to further define provocation, it could properly have refused to do so. For this reason, defendant cannot show that defense counsel's failure to request such an instruction was objectively unreasonable.

Similarly, counsel's failure to request an instruction that a third party such as Virginia or defendant's infant daughter, rather than the homicide victim, could be a source of provocation was not objectively unreasonable. Our Supreme Court has repeatedly explained that the objective, reasonable person requirement for heat of passion "*requires provocation by the victim*." (*People v. Steele* (2002) 27 Cal.4th 1230, 1253, italics added.) In *People v. Lee* (1999) 20 Cal.4th 47, 59, for example, the Supreme Court stated that "the provocation which incites the defendant to homicidal conduct in the heat of passion *must be caused by the victim* [citation], *or be conduct reasonably believed by the defendant to have been engaged in by the victim*. [Citations.]" (Italics added;

13

accord *People v. Moye* (2009) 47 Cal.4th 537, 549-550; see also *Lee*, at p. 59 ["The *provocative conduct by the victim* may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." (Italics added.)].) Given the above authorities requiring provocative conduct by the victim, counsel's failure to request that the court expressly instruct the jury that sufficient provocation could be by someone other than the victim was not objectively unreasonable.

Defendant's reliance on *People v. Le* (2007) 158 Cal.App.4th 516 for the contrary position--that acts by a third party such as Virginia or her infant daughter rather than the victim can be sufficient provocation for voluntary manslaughter--is misplaced. In *Le*, the defendant claimed that instruction with CALCRIM No. 917 " 'that mere "words" cannot establish a defense to battery, and in permitting the prosecutor to argue to the jury, over objection, that "words" cannot legally constitute "provocation" to reduce a homicide to manslaughter' " was error. (*Le*, at p. 525.) The court agreed, pointing out that under established law, the provocation necessary to reduce murder to voluntary manslaughter may be either physical or verbal. (*Id.* at pp. 527-529.) No such erroneous instruction was given here. A case is not authority for a proposition not considered. (*People v. Casper* (2004) 33 Cal.4th 38, 43.)

To the extent defendant argues that the trial court's response improperly focused on the victim's actions rather than defendant's mental state, he does so based on a single comment made in the presence of counsel, but not before the jury. The court's remark -- that "generally the answer would be to reduce a crime to -- to eliminate malice, we're focused on the acts of the victim as to how it affects the defendant" -- is a proper statement of the law. (See e.g., *People v. Lee, supra*, 20 Cal.4th at p. 59 ["the provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim"].) It also takes into account how conduct might

14

"*affect*[ ] *the defendant*," which necessarily includes the conduct's effect on a defendant's mental state. (Italics added.) And more importantly, because the court did not make the statement in the jury's presence, it could not have affected the jury during deliberations.

Finally, the prosecutor's closing argument regarding heat of passion does not convince us that counsel should have requested a further instruction regarding provocation by someone other than the victim. In closing, the prosecutor argued that "the provocation is not shooting an arrow at the vehicle. The provocation would be some other sort of heat of passion. He wasn't provoked. There has to be some other sort of provocation." Defendant contends that in light of the prosecutor's argument, coupled with the instructions as given, the jury was implicitly focused only on provocation by Jopp. But almost immediately after this statement, the prosecutor further argued: "Even if you find it's provocation that [Jopp] . . . is dating his wife, his estranged wife, if he had time to cool off about it, then you can't come in here and say it should be voluntary manslaughter." This portion of the prosecutor's argument, not cited by defendant, suggests that Virginia and her affair with Jopp *could* constitute provocation for purposes of reducing a murder to manslaughter under CALCRIM No. 570, but that defendant had sufficient time to cool off from Virginia's provocative infidelity. Defendant's argument that he did *not* have time to cool off about his wife's ongoing affair with Jopp in light of Virginia's phone calls before the killing shows only that defendant disagrees with how the jury resolved this issue against him. It does not demonstrate that the jury was improperly instructed regarding provocation, that the court's response to the jury's question was inadequate, or that trial counsel rendered ineffective assistance for failing to request further instructions.

## II

### *Definition of Provocation*

Defendant contends the trial court erred in failing to define "provocation" for the jury in light of the unique facts of this case. He argues the terms "provoke" and

15

"provocation" as used in CALCRIM No. 570 have a " 'technical meaning peculiar to the law' " that required further definition for the jury. Defendant did not request that the court provide a technical definition of provocation thereby forfeiting the issue on appeal. (*People v. Dykes, supra*, 46 Cal.4th at p. 802.)

In any event, even if properly preserved for review, we have already found that the term "provocation," for purposes of reducing the degree of murder has its "common meaning, which required no further explanation in the absence of a specific request" (*Cole, supra,* 33 Cal.4th at pp. 1217-1218), and that the same common meaning applies equally to the term provocation as used in CALCRIM No. 570. For reasons previously stated, we reject defendant's ineffective assistance of counsel claim.

### III

#### *Presentence Credits*

Defendant argues the trial court erred in awarding custody credits under section 2900.5. He contends he was entitled to 468 days of presentence custody credit. The People agree the court erred in calculating credits, but contend defendant was actually entitled to 470 days of credit. We agree with the People, and shall correct his credits accordingly.

"In all felony and misdemeanor convictions, either by plea or by verdict, when the defendant has been in custody . . . all days of custody of the defendant . . . shall be credited upon his or her term of imprisonment . . . ." (§ 2900.5, subd. (a).) For purposes of credits under section 2900.5, a partial day, including the day of sentencing, is counted as a full day. (*People v. Smith* (1989) 211 Cal.App.3d 523, 526.)

In this case, the trial court awarded defendant 449 days of custody credit, likely based on the custodial time he spent in San Joaquin County after being extradited from Missouri around September 24 or 25, 2018. But evidence in the record shows that a *Ramey* warrant (*People v. Ramey* (1976) 16 Cal.3d 263) to arrest defendant was issued throughout the nation and was entered into the "system" on or about July 5, 2018, and

16

that defendant was arrested on a warrant in Missouri on September 3, 2018. From defendant's arrest in Missouri on September 3, 2018, through his date of sentencing on December 16, 2019, 470 days elapsed. Thus, defendant was entitled to 470 days of presentence custody credit. (§ 2900.5, subd. (a).) We shall correct his custody credits accordingly.

## DISPOSITION

Defendant's conviction is affirmed. The judgment is modified to award defendant 470 days of presentence custody credit. As so modified, the judgment is affirmed. The court is directed to verify the proper spelling of defendant's surname. The clerk shall prepare an amended abstract of judgment, including the correct spelling of defendant's surname, and shall forward a copy to the Department of Corrections and Rehabilitation.


/s/
HOCH, J.


We concur:


/s/
ROBIE, Acting P. J.


/s/
KRAUSE, J.

17